952 So.2d 484 (2006)
Meryl S. McDONALD, Appellant,
v.
STATE of Florida, Appellee.
Meryl S. McDonald, Petitioner,
v.
James R. McDonough, etc., Respondent.
Nos. SC03-648, SC04-708.
Supreme Court of Florida.
November 2, 2006.
Rehearing Denied March 12, 2007.
*487 John William Jennings, Capital Collateral Regional Counsel, Middle Region, and Peter James Cannon and Daphney Elaine Gaylord, Assistant CCR Counsel, Tampa, FL, for Appellant/Petitioner.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL and Katherine V. Blanco, Senior Assistant Attorney General, Tampa, FL, for Appellee/Respondent.
PER CURIAM.
Meryl S. McDonald, a prisoner under a sentence of death for a conviction of first-degree murder, appeals an order of the circuit court denying a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850 and petitions the Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. After review, we affirm the denial of relief and deny the petition for writ of habeas corpus.

FACTS AND PROCEDURAL HISTORY
The underlying circumstances of this case are set out in our opinion affirming the conviction and death sentence of McDonald's codefendant, Robert R. Gordon. Gordon v. State, 704 So.2d 107, 108-09 (Fla.1997). Dr. Louis A. Davidson was murdered on January 25, 1994. Five persons, including McDonald, were indicted for the crime of murder in the first degree by a grand jury on April 27, 1994. Dr. Davidson's estranged wife, Denise A. Davidson, and her boyfriend, Leonardo A. Cisneros, hired McDonald and Gordon to kill Davidson. The fifth person indicted, Susan C. Shore, was hired by McDonald and Gordon to drive them to the victim's apartment in St. Petersburg. On the day of the murder, McDonald and Gordon murdered the victim inside his apartment while Shore remained outside in her car. After the murder, Shore drove Gordon and McDonald to a Days Inn motel in Tampa where they changed clothes and eventually met with Denise Davidson and Cisneros, whom they had also met the day before the murder. After Gordon and McDonald conferred with Denise Davidson and Cisneros, out of Shore's hearing, Shore drove Gordon and McDonald back to Miami.
McDonald and Gordon were tried together and convicted of first-degree murder. The jury recommended by identical votes of nine to three that each should be sentenced to death. The trial court followed the jury's recommendation and sentenced McDonald to death. In imposing the death penalty, the trial court found four aggravating factors: (1) the murder was committed during the commission of a burglary/robbery; (2) the murder was committed for pecuniary gain (based on a contract killing); (3) the murder was heinous, atrocious, or cruel (HAC); and (4) the murder was cold, calculated, and premeditated (CCP). McDonald v. State, 743 So.2d 501, 502 (Fla.1999). The trial court found no statutory mitigating factors and three nonstatutory mitigators: (1) McDonald's *488 good prison behavior; (2) McDonald's advanced age at the time he would be eligible for release if sentenced to imprisonment; and (3) codefendant Denise Davidson's receipt of a life sentence. Id. On appeal, this Court found no error and affirmed McDonald's conviction and sentence. Id. at 507.
After initiation of postconviction proceedings, McDonald was represented by the Office of Capital Collateral Regional Counsel (CCRC), which initially prepared McDonald's motion for postconviction relief. When McDonald would not sign and swear to this motion, CCRC filed the unsworn motion and McDonald filed his own separate motion. CCRC thereafter filed a certification of conflict and a motion to withdraw and for appointment of conflict-free counsel because McDonald would not sign and verify the motion prepared by CCRC. At a hearing, the circuit court determined that there was no legal conflict, and McDonald later agreed to sign and verify an amended motion prepared by CCRC.
Subsequently, however, McDonald filed "Defendant's Motion to Remove Conflict Counsel, and to Strike Counsel 3.850 Motion, and Motion for Reconsideration, and for Self-Representation." The circuit court decided that there still was no conflict, and, thus, no reason for CCRC not to represent McDonald. When McDonald insisted that he wanted to represent himself, rather than have CCRC represent him, the circuit court conducted an extensive inquiry on the record pursuant to Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Based upon McDonald's insistence and the failure of CCRC to cite any legal grounds to the contrary, the circuit court determined that it had no legal alternative but to allow McDonald to represent himself. Thereafter, CCRC was appointed as stand-by counsel, and appeared as stand-by counsel for McDonald throughout the remainder of the postconviction proceedings. The circuit court further allowed McDonald, acting as his own counsel, to withdraw the motion filed by CCRC and substitute his own postconviction motion that he had previously filed. Later, McDonald filed "Defendant's Motion to Amend and Supplemental 3.850 Postconviction Relief Motion," in which he raised sixteen claims. In his 3.850 motion, McDonald raised the following issues: (1) trial counsel was ineffective with regard to the jury selection; (2) there was no waiver of defendant's rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); (3) trial counsel was ineffective for failing to challenge the hair evidence; (4) trial counsel was ineffective for failing to challenge the carpet fiber evidence; (5) the State's cashmere fiber testimony was false and trial counsel was ineffective for not challenging it; (6) trial counsel was ineffective with regard to the bloodstain evidence; (7) trial counsel was ineffective by failing to raise an argument concerning the contamination of the sweatshirt; (8) trial counsel was ineffective by failing to challenge the shoe print and tennis shoes evidence; (9) trial counsel was ineffective for failing to keep Susan Shore from testifying; (10) State witnesses lied about identification issues; (11) trial counsel was ineffective for not pursuing a severed trial; (12) trial counsel was ineffective for failing to investigate and present an alibi defense; (13) trial counsel was ineffective for failing to object to an improper closing argument by the prosecutor; (14) trial counsel was ineffective for failing to file a motion for a speedy trial; (15) the trial court lacked jurisdiction because the autopsy failed to establish the cause of death; and (16) when the claims are examined collectively, trial counsel provided ineffective assistance of counsel.
*489 The circuit court held a preliminary hearing pursuant to Huff v. State, 622 So.2d 982 (Fla.1993), and at the hearing, McDonald waived issues (2) and (10). The circuit court summarily denied issues (1), (3), (4), (5), (7), (8) through (13), (15), and (16) and granted an evidentiary hearing on issues (6), (11), (12), and (14). An evidentiary hearing was conducted, and thereafter, the circuit court entered a written order denying all claims for postconviction relief.
On appeal, CCRC filed an amended brief with this Court on behalf of McDonald, raising thirteen issues.[1]

RULE 3.850 APPEAL
Initially, CCRC raises several claims on appeal that it asserts were not adequately presented below because McDonald failed to raise them when he was allowed to represent himself during the postconviction proceedings. Because we conclude that the circuit court properly allowed McDonald to represent himself, these claims may not be raised for the first time on appeal.[2] Similarly, some of the other claims now asserted by CCRC are procedurally barred because they were not raised below.[3]See Perez v. State, 919 So.2d 347, 359 (Fla.2005) (holding that in order to preserve an issue for appeal, the issue "must be presented to the lower court and the specific legal argument or ground to be argued on appeal must be part of that presentation") (quoting Archer v. State, 613 So.2d 446, 448 (Fla.1993)), cert. denied, ___ U.S. ___, 126 S.Ct. 2359, 165 L.Ed.2d 285 (2006). Finally, we reject several other claims that present merely conclusory arguments insufficient to state an issue.[4]See LeCroy v. Dugger, 727 *490 So.2d 236, 240-41 (Fla.1998) (upholding the summary denial of a postconviction motion because the defense alleged no facts to substantiate its conclusory claims of ineffective assistance of counsel); see also Randolph v. State, 853 So.2d 1051, 1063 n. 12 (Fla.2003) ("[T]he purpose of an appellate brief is to present arguments in support of the points on appeal.") (quoting Duest v. Dugger, 555 So.2d 849, 852 (Fla. 1990)). We now address McDonald's remaining claims.

I. The Faretta Inquiry
CCRC argues that the circuit court violated both the Florida and Federal Constitutions by conducting an inadequate inquiry under Faretta, and allowing Mr. McDonald to proceed pro se at his postconviction proceedings below. However, the circuit court performed a thorough and extensive Faretta inquiry, and CCRC, when given the opportunity to do so, asserted no basis for denying McDonald's request to represent himself.
Initially, we examine the claim that the circuit court failed to conduct an adequate Faretta inquiry.[5] We note at the outset, during the Faretta inquiry, the circuit court specifically requested additional input from CCRC by asking, "Do you know of any reason why I shouldn't appoint him to represent himself?" In response to the circuit court's question, CCRC's "only concern" was the issue of "conflict-free counsel." CCRC also conceded that no new grounds existed to arguably support the alleged "conflict-free counsel" claim, an issue which the circuit court previously addressed and denied. Despite the circuit court's specific request for CCRC's input, no challenge was ever raised concerning the adequacy of the Faretta inquiry or otherwise regarding the manner or substance of the trial court's treatment of this issue.
Assuming that the current challenge to the adequacy of the circuit court's Faretta inquiry is properly before us, the claim is without merit. The following excerpts from the Faretta inquiry demonstrate the thoroughness of the trial court's inquiry:
THE COURT: Okay. As I go through this, I'm going to talk to you a little bit about some of the advantages and disadvantages of representing yourself. You obviously have put in your motion that you're aware of that, and you're quite aware of all the discussions of the disadvantage of representing yourself, right?
THE DEFENDANT: Yes, your Honor.
THE COURT: Okay. In your motion, I don't have it in front of me, but I remember when I read it you have adopted a lot of what CCRC filed on your behalf, and then you put some other stuff with it, right? That's my recollection. I may be wrong on that.
THE DEFENDANT: No, your Honor.
THE COURT: You did not?
THE DEFENDANT: No. What CCRC claims and my claims are different, in conflict. Two motion, but we all different grounds, different arguments.

*491 THE COURT: Okay. If in your motion there are any, what we will call legal claimsnot factual claims; I am innocent, this should have been done, the hair isn't mine, factual things. If there are any legal issues raised, constitutionality of the death penalty, Caldwell issues, all those things CCRC may tend to raise in the State court hoping to obtain perhaps relief in a Federal court, those claims oftentimes have to be raised in the State court to get relief in the Federal court. Do you understand that?
THE DEFENDANT: Yes, your Honor.
THE COURT: Okay. And do you understand that if you are not successful in the State court, you may have a right to have a hearing on certain things in the Federal courts?
THE DEFENDANT: Yes, your Honor.
THE COURT: Okay. You may find that if certain things weren't done or raised in the State court, that you can't raise them in the Federal court and, therefore, they're gone.
THE DEFENDANT: I understand that.
THE COURT: You understand that?
THE DEFENDANT: Yes, your Honor.
THE COURT: And do you understand one of the problems with representing yourself at this stage, in a complex case like this, where the death penalty has been imposed, is that CCRC is usually up on things; they go to seminars, talk about those issues. We call them hot topics sometimes in seminars, things that it is believed that perhaps the Federal courts are going to take a look at and things that are probably dead issues and things that may be coming up on the horizon, is my terminology. But they will raise things that are pretty well settled in the State of Florida that they know they're going to lose here, because they're trying to preserve them for Federal review, hoping that they can get relief either in a District Court, Federal District Court, Eleventh Circuit Court of Appeals or the United States Supreme Court.
THE DEFENDANT: Yes, ma'am, I'm aware of that, your Honor.
THE COURT: Do you understand you may be at a disadvantage there because you would not have any way of having been to those seminars and know what those topics are?
THE DEFENDANT: Yes, your Honor.
THE COURT: And do you understand that the Federal court, just like I can't give you any special privileges if you elect to represent yourself, neither will they? So if you had to raise something here to raise it in Federal court and you don't, and I let you represent yourself, they're going to say, just like as if you were represented by a lawyer, it's waived. Do you understand that?
THE DEFENDANT: Yes, ma'am.
THE COURT: Can't be raised. Might be valid, but it can't be raised because Mr. McDonald chose to represent himself in State court and he didn't raise it. Do you understand that?
THE DEFENDANT: Yes, your Honor.
THE COURT: Okay. That's one of the disadvantages. Do you agree with that? Right?
THE DEFENDANT: Yes, your Honor.
THE COURT: Okay. As I was reading through the petition that you had filed in the Supreme Courtand I have not read your motion for postconviction relief in some time, but I did receive what you filed in the Supreme Courtit appears to me as if you're challenging or saying you want to challenge some things like DNA, Motions to Suppress, expert witnesses, hair analysis, this type *492 of thing. Is that true? Is that some of the stuff you want to challenge?
THE DEFENDANT: Yes, your Honor.
THE COURT: Okay. Do you realize that you, as kind of a person with training, but not as much training as your lawyer, are at a certain disadvantage in kind of going toe to toe with an expert who supposedly is an expert in his or her field?
THE DEFENDANT: Repeat the question, your Honor.
THE COURT: Okay. Do you understand you may be at a disadvantage if in fact I grant you a hearing and you or the State calls an expert witness in the field of DNA, which is pretty technical, and you are representing yourself as your own lawyer, that you may be at a disadvantage in being able to challenge him on cross examination because you simply will not be as up on DNA expertise as a lawyer would be?
THE DEFENDANT: Yes, your Honor.
THE COURT: Okay. Do you understand that you would not be as knowledgeable as a trained lawyer would be on the rules of evidence?
THE DEFENDANT: Yes, ma'am.
THE COURT: And, therefore, the State may ask a question or a series of questions or go into a certain area that they may not be entitled to, but you wouldn't know necessarily to object; you might, but you wouldn't be as trained in those areas as a lawyer would be. You understand that?
THE DEFENDANT: Yes, your Honor.
THE COURT: Okay. Okay. Now I'm going to read you some of the stuff they want me to read to you, okay? So listen carefully. It is almost always unwise to represent yourself in court. I'm telling you that. Let me tell you a few of the disadvantages of representing yourself in court. Do you understand that you will not get any special treatment from this court or any other court just because you are representing yourself?
THE DEFENDANT: Yes, your Honor, I understand that.
. . . .
THE COURT: Okay. This apparently is the ultimate question here, and I'm going to once again read it just the way they've got it: Having been advised of your right to counsel, do you understand you have the right to counsel?
THE DEFENDANT: Yes, ma'am.
THE COURT: You understand I have told you as much as I can the advantages of having counsel?
THE DEFENDANT: Yes, your Honor.
THE COURT: And the disadvantages of representing yourself?
THE DEFENDANT: Yes, your Honor.
THE COURT: The dangers of proceeding without counsel?
THE DEFENDANT: Yes, your Honor.
THE COURT: You know the nature and possible consequences if you do? In other words, you are on death row and you're fighting for your life. You understand that?
THE DEFENDANT: Yes, your Honor.
THE COURT: Are you certain that you want to represent yourself and not have a lawyer represent you?
THE DEFENDANT: Yes, your Honor.
THE COURT: You do understandI mean, as I said, you and I have been together in court many times over the course of many days, so it just seems kind of silly to ask it: You do understand that you have received a death sentence and in the event that you are not successful at one of these stages, that you will have a death sentence carried out? You understand that?

*493 THE DEFENDANT: Yes, your Honor.
THE COURT: You know what's at stake here, quite clearly, right?
THE DEFENDANT: Yes, your Honor.
THE COURT: Okay. Does the State have any questions?
MS. KING: No, your Honor.
THE COURT: Correct me if I'm wrong, Miss King, but my recollection of the last time I read the law or was in a seminar where this was discussed, no matter howI mean, I'm going to tell you in the strongest terms possible, Mr. McDonald, I really wish you wouldn't do this, because I think it's dangerous. I think you would receive better representation from a lawyer. I think you have a better chance of succeeding if you had a lawyer. And II don't want to just keep pounding on this, but I'm not saying this because I'd just as soon deal with a lawyer as deal with you, I mean it. Do you understand that?
THE DEFENDANT: Your Honor, counsel here, I respect hishis action. However, the motion that counsel prepared is motion that he prepared for postconviction relief. I disagree with the claim as argument. Now, if he can work with me, work with me with my claims, it be good. But his claim is what bother me. He try to demonstrate to this court on my behalf, which I object to.
THE COURT: Thatthat we kind of went through last time.
THE DEFENDANT: Yes, your Honor.
THE COURT: In other words, you had a conflict, you and he. You and I talked about it, I ruled there wasn't a conflict.
THE DEFENDANT: Yes.
THE COURT: You're appealing that ruling, so we're kind of past that.
THE DEFENDANT: Okay, your Honor.
THE COURT: So I guess what I'm suggesting to you is, do you understand I am telling you in the strongest possible terms, I've got nothingI've got nothing against you personally, I'm dealing within a legal system here, but I'm telling you as judge to another human being in this courtroom, I think it is a huge mistake for you to represent yourself in a case that carries the death sentence. Do you understand that?
THE DEFENDANT: Yes, your Honor.
THE COURT: All right. And you still wish to do that?
THE DEFENDANT: Yes, your Honor.
We conclude that after McDonald requested to represent himself during postconviction proceedings, the circuit court went above and beyond what is required under the dictates of Faretta.[6] After reviewing the transcript, which consisted of over fifty pages, we recognize that the circuit court only reluctantly allowed McDonald to represent himself during the *494 postconviction proceedings. Therefore, we deny CCRC's claim that the court did not conduct an adequate Faretta inquiry. Further, because CCRC made no other arguments in the trial court contesting McDonald's self-representation, we decline to address any arguments now asserted by CCRC for the first time on appeal.

II. Brady and Giglio Claims
In claim (4) of its amended brief, CCRC asserts claims pursuant to Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), alleging that the State withheld crucial DNA evidence and that the State presented false evidence. However, McDonald did not assert a specified legal claim under Brady or Giglio in his pro se postconviction motion. Accordingly, some of CCRC's current legal claims could be procedurally barred. See Perez, 919 So.2d at 359. However, CCRC does include some allegations that were presented in McDonald's pro se supplemental motion before the circuit court on the underlying bloodstain evidence claim. Specifically, McDonald asserted below: (1) Agent Michael Vick never conducted the DNA tests; (2) Agent Vick had no training in DNA tests; (3) Agent Vick was not a DNA expert; and (4) no DNA match of the victim's blood was found on the gray sweatshirt.
The circuit court denied these claims because it found that all of McDonald's criticisms against Agent Vick were refuted by the trial testimony of Agent Vick. Furthermore, McDonald offered no evidence at the evidentiary hearing to refute Vick's testimony or the DNA evidence. Because CCRC only resurrects some of McDonald's arguments that were denied by the circuit court and asserts no basis, other than conclusory arguments, for a Brady or Giglio claim, this claim is denied.

III. Ineffective Assistance of Counsel
In accordance with the United States Supreme Court's decision in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), this Court has held that two elements must be met for ineffective assistance of counsel claims to be successful: (1) The claimant must identify particular acts or omissions of the lawyer that are outside of the broad range of reasonably competent performance under prevailing professional standards, and (2) the deficiency shown must be demonstrated to have so affected the proceeding that confidence in the outcome is undermined. See, e.g., Lott v. State, 931 So.2d 807, 815 (Fla.2006); Happ v. State, 922 So.2d 182, 186 (Fla.2005).
A. Bloodstain Evidence
In his pro se motion for postconviction relief, McDonald alleged a three-part claim of ineffective assistance of counsel regarding the bloodstain evidence. First, McDonald alleged that trial counsel was ineffective in failing to move to suppress evidence of a bloodstain on the sweatshirt "as lost or destroyed." Second, McDonald alleged that his trial attorney was ineffective for failing to obtain a DNA expert. Third, McDonald alleged ineffective assistance of counsel in failing to request a Frye[7] hearing. The circuit court denied McDonald's bloodstain evidence claims.
First, CCRC contends that McDonald is entitled to relief because the State's evidence of a bloodstain on the sweatshirt has either been lost or destroyed. However, we have previously held that if evidence is lost or totally consumed during testing, the burden is on the *495 defendant to show bad faith by the State in failing to preserve evidence. See King v. State, 808 So.2d 1237, 1242-43 (Fla.2002) (citing Arizona v. Youngblood, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988)). In denying postconviction relief after an evidentiary hearing, the circuit court ruled that even if the bloodstain evidence had been consumed in the testing, the DNA materials, such as photographs of the DNA test results, autoradiographs, x-rays, and perhaps more, are still available for comparison should anyone want to verify that the DNA is Dr. Davidson's. Therefore, even if the bloodstain may have been unavoidably consumed in the DNA testing, the DNA materials from the test are not "lost or destroyed" because comparisons can still be made. As a result, the trial court concluded trial counsel was not ineffective for failing to file a motion to suppress the bloodstain evidence based on the theory that the evidence had been lost or destroyed, and we find no error in that determination.
Next, CCRC contends that trial counsel was ineffective for failing to engage the services of a DNA expert. However, trial counsel testified at the evidentiary hearing that he made a strategic, informed decision not to challenge the DNA evidence that showed the victim's blood on McDonald's shirt. The defense theory was that Gordon and McDonald went to the victim's apartment to retrieve a document from the victim. After they left the apartment, Leo Cisneros killed the victim and later planted the DNA evidence on McDonald's shirt. Given this defense theory, the DNA evidence would not seem to be an issue. In fact, the additional presence of unknown DNA on McDonald's shirt would seem to bolster their claim that they were framed. Moreover, the defense DNA expert, Dr. Renee Herrera, agreed with Agent Vick that the identification of the bloodstain from the sweatshirt was consistent with the known victim's blood sample. From the evidentiary hearing and trial transcripts, trial counsel decided after discussions with McDonald, codefendant Gordon, and codefendant Gordon's counsel, to use the small amount of blood found on the sweatshirt at the motel to support the defense that someone else committed the murder and framed McDonald. Trial counsel testified that he discussed this strategy with McDonald, i.e., that they would not challenge the DNA because it was not harmful to their planned defense. Therefore, we conclude that McDonald has not demonstrated that the trial court erred in concluding that trial counsel's tactical decision was not deficient performance. See Whitfield v. State, 923 So.2d 375, 381 (Fla.2005) ("Strategic decisions do not constitute ineffective assistance if alternative courses of action have been considered and rejected.") (quoting Rutherford v. State, 727 So.2d 216, 223 (Fla.1998)).
Finally, CCRC contends that the use of ethnic substructures and population frequencies was not generally accepted by the scientific community at the time of McDonald's trial, and therefore, trial counsel was ineffective for not requesting a Frye hearing on the bloodstain evidence. CCRC relies on Vargas v. State, 640 So.2d 1139 (Fla. 1st DCA 1994), quashed on other grounds, 667 So.2d 175 (Fla.1995). In Vargas, the court concluded that the Frye standard could not be met when using DNA population frequencies because there was a lack of general acceptance in the scientific community of the FBI's Hispanic Database. Vargas, 640 So.2d at 1150. However, Vargas was later distinguished in Crews v. State, 644 So.2d 338, 339 (Fla. 1st DCA 1994), which concluded that DNA test results are not per se inadmissible. The circuit court stated that at *496 the time of McDonald's 1995 trial, there was general acceptance in the scientific community for forensic population genetics to permit Agent Vick's testimony, including his population frequency testimony. We find no error in the trial court's conclusion that trial counsel was not ineffective for failing to request a Frye hearing.[8]
B. Suppression of the Hair Evidence
McDonald's pro se postconviction motion alleged three sub-claims of ineffective assistance of counsel concerning his hair sample obtained by police and submitted to the FBI for comparison with the hair found on the sweatshirt seized from the Days Inn. First, McDonald alleged that his hair samples were illegally seized by fraud, without court order, and that trial counsel was ineffective for failing to move to suppress. Second, McDonald alleged that the testimony of Detective Celona and FBI Agent Allen was false concerning the dates of submission of McDonald's hair samples and the result of the FBI's comparison, that the State knew it was false, and that trial counsel was ineffective for failing to move to suppress. Third, McDonald alleged fundamental error and ineffective assistance for failure to require adherence to Frye. In denying postconviction relief, the circuit court ruled that counsel was not deficient for not moving to suppress McDonald's hairs, which could have been legally obtained and tested again at any time. Next, the circuit court ruled that McDonald did not show that the testimony of Detective Celona and Agent Allen was false. Finally, the circuit court concluded that no Frye hearing is required before the opinion testimony of a hair analyst can be admitted in a trial.
*497 CCRC again asserts that trial counsel was ineffective in failing to adequately challenge the testimony of FBI Agent Allen and investigate the State's hair evidence. "[W]here defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious." Zakrzewski v. State, 866 So.2d 688, 694 (Fla.2003) (quoting Kimmelman v. Morrison, 477 U.S. 365, 375, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986)).
First, with regard to the police illegally obtaining McDonald's hair samples, the police may obtain a defendant's hair sample without a search warrant if the defendant voluntarily consents to providing the sample. See Murray v. State, 692 So.2d 157, 159-60 (Fla.1997) (allowing for the seizure of hair samples after the defendant waived his Miranda rights and consented to giving the samples). Here, the detectives testified that they asked McDonald for his hair samples to eliminate him as a suspect.[9] Further, McDonald signed Miranda waiver forms in the presence of Detectives Noodwang and Taranto on February 23 and 24, 1994, once as Rudolph Bowens and once as Meryl McDonald. Moreover, he voluntarily consented to giving the detectives samples of his hair. Based on the record, the circuit court stated that it would not have suppressed the hair evidence; therefore, trial counsel was not ineffective for failing to file a motion to suppress the hair evidence. We hold that the lower court did not err in finding that the hair samples were not illegally obtained and that trial counsel was not ineffective for not filing a motion to suppress this evidence.
Next, in denying McDonald's second sub-issue, we find no error in the conclusion that there was no hair evidence that defendant's trial counsel could have moved to suppress because of the detectives' alleged false testimony. Detective Celona testified that he received defendant's hair sample from Detective Noodwang on March 1, 1994, placed it in evidence, and later sent it to the FBI on March 17, 1994, the same date that codefendant Gordon's hair samples were sent. He identified the hair samples that he had received from Detective Noodwang. On direct examination, Agent Allen identified his initials and designations on McDonald's hair samples that he found to match with trace evidence hair he collected from the sweatshirt. He explained that hair comparison is not a positive identification, as is fingerprint comparison, but did identify the hairs as included for a possible match. Agent Allen described the unusual dyed characteristics of defendant's known hair samples and those of the facial and head hairs he had found on the sweatshirt. McDonald's girlfriend, Carol Cason, testified at trial that McDonald had dyed his hair and beard but that it had gotten lighter by the time of trial. Trial counsel did not file a motion to suppress this evidence, but he did cross-examine these witnesses about the hair evidence. We find no error in the circuit court's conclusion that trial counsel was not ineffective for failing to file a motion that would not have been granted.
*498 Finally, Agent Allen conducted only a microscopic and visual comparison of the hair evidence. Visual and microscopic hair comparison is not based on new or novel scientific principles and, therefore, does not require a Frye analysis. See Jent v. State, 408 So.2d 1024, 1029 (Fla.1981). As a result, the trial court did not err in concluding that counsel was not ineffective for failing to request a Frye hearing.

PETITION FOR WRIT OF HABEAS CORPUS
Having affirmed the trial court's denial of McDonald's 3.850 motion, we now consider McDonald's petition for writ of habeas corpus. McDonald claims that he is entitled to relief because (1) the United States Supreme Court decided Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and (2) the trial court conducted an inadequate inquiry under Faretta.

I. Ring Claim
Recently, this Court held that Ring does not apply retroactively. Johnson v. State, 904 So.2d 400, 407 (Fla.2005). Because Ring was decided after McDonald's convictions became final, Ring is inapplicable. McDonald's claim raises no new issues and therefore is without merit.

II. Inadequacy of the Faretta Inquiry
CCRC reasserts the same argumentthe trial court conducted an inadequate Faretta inquirythat it presented in Issue I of the postconviction appeal. As this Court has repeatedly stated, habeas corpus petitions cannot be used as a means to seek a second appeal or to litigate issues that could have been or were raised in a postconviction appeal. See Knight v. State, 923 So.2d 387, 395 (Fla.2005) (citing Baker v. State, 878 So.2d 1236, 1241 (Fla. 2004); Parker v. Dugger, 550 So.2d 459, 460 (Fla.1989)). Therefore, this claim is procedurally barred. Furthermore, as discussed in our above analysis of the Faretta inquiry, this claim is also without merit. As a result, this claim is denied.

CONCLUSION
For the reasons discussed above, we affirm the circuit court's denial of postconviction relief and deny the petition for writ of habeas corpus.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] In its amended brief, CCRC argued: (1) the trial court erred by conducting an improper Faretta inquiry and allowing McDonald to proceed during the postconviction proceedings pro se; (2) trial counsel was ineffective for failing to challenge the racial composition of the jury venire; (3) trial counsel was ineffective for failing to object to the prosecutor's closing argument concerning the pain and suffering felt by the victim; (4) the State suppressed evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and presented false evidence in violation of Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); (5) trial counsel was ineffective for failing to move to exclude the illegally obtained physical evidence; (6) trial counsel was ineffective for failing to challenge the State's fiber testimony; (7) trial counsel was ineffective for failing to challenge forensic evidence; (8) trial counsel was ineffective for failing to challenge physical evidence; (9) trial counsel was ineffective for failing to challenge the expert shoe imprint testimony; (10) trial counsel was ineffective for failing to challenge the testimony of a co-conspirator; (11) trial counsel was ineffective for failing to move to sever; (12) trial counsel was ineffective for failing to investigate an alibi defense; and (13) McDonald did not make a knowing, intelligent, and voluntary waiver of his postconviction counsel.
[2] As set out in CCRC's brief, these claims include issues (8) through (12): (8) (trial counsel was ineffective for failing to challenge physical evidence); (9) (trial counsel was ineffective for failing to challenge the expert shoe imprint testimony); (10) (trial counsel was ineffective for failing to challenge the testimony of a co-conspirator); (11) (trial counsel was ineffective for failing to move to sever); and (12) (trial counsel was ineffective for failing to investigate an alibi defense).
[3] The following claims are procedurally barred because they were not raised by McDonald below: (2) (trial counsel was ineffective for failing to challenge the racial composition of the jury venire), and (3) (trial counsel was ineffective for failing to object to the prosecutor's closing argument concerning the pain and suffering felt by the victim).
[4] Claim (6) (trial counsel was ineffective for failing to challenge the State's fiber testimony) is such a claim. CCRC has only restated McDonald's allegations which were rejected below and has offered nothing to undermine the circuit court's analysis and rejection of this claim. Also, claim (13) (McDonald did not make a knowing, intelligent, and voluntary waiver of his postconviction counsel) is essentially a one-half page restatement of issue (1) raised in CCRC's amended brief.
[5] We are troubled by the assertion made in CCRC's amended brief that "this Court has no record of the Faretta inquiry and whether the correct colloquy was given." However, we do have a record of the extensive Faretta inquiry performed by the circuit court. The supplemental record, which was filed approximately four months before the amended brief was filed with this Court, includes the transcript of the Faretta hearing held in the circuit court. This inaccurate statement was never corrected by CCRC prior to oral arguments before this Court.
[6] Here, the circuit court warned McDonald numerous times of the severe disadvantages of proceeding pro se. The circuit court found that McDonald was competent to represent himself and granted McDonald's motion for self-representation. The record before us confirms that McDonald's decision was knowing, intelligent, and voluntary. The transcript of the hearing below shows that the circuit court conducted a detailed Faretta evaluation of the defendant, eliciting information that McDonald was forty-seven years old at the time of the hearing, had completed high school and two years of college, reads and speaks the English language, was not under any medication, and understood the purpose of the hearing. Additionally, the transcript reflects that McDonald repeatedly exhibited an understanding of the consequences of waiving his rights to postconviction counsel. Finally, McDonald's responses to the questions posed by the circuit court demonstrated that he understood his legal options and the consequences.
[7] Frye v. United States, 293 F. 1013 (D.C.Cir. 1923).
[8] Importantly, we previously denied codefendant Gordon's virtually identical postconviction ineffective assistance/DNA claims, finding that he was not entitled to relief on either his ineffective assistance/lost evidence or DNA/Frye claim:

Next, Gordon asserts that the trial court erred in summarily denying his claim that trial counsel was ineffective for failing to seek to exclude the results of scientific tests where, through no fault of the State, the material tested was destroyed. Even if trial counsel's performance was deficient, Gordon has not shown how the innocent consumption of the DNA prejudiced him. In order to prevail on a claim involving destruction of DNA samples, a defendant must prove that the State acted in bad faith. See Arizona v. Youngblood, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). Additionally, Florida courts have held that the unavoidable consumption of testing material does not trigger a constitutional violation. See State v. T.L.W., 457 So.2d 566 (Fla. 2d DCA 1984); State v. Herrera, 365 So.2d 399 (Fla. 3d DCA 1978). Therefore, as Gordon has neither asserted a claim of bad faith nor explained any prejudice in this instance, he is not entitled to relief here.
. . . .
Next, Gordon argues that trial counsel was ineffective for failing to challenge the admissibility of DNA evidence and failing to request a Frye hearing. At the evidentiary hearing, trial counsel and codefendant McDonald's counsel expressly indicated that as a part of the defense strategy, it was actually desirable to present to the jury the unidentified DNA evidence that did not implicate either Gordon or McDonald, in order to corroborate the defense theory of what happened the day of the murder. It was also a part of the strategy to get before the jury the small amount of DNA that implicated McDonald because it supported the defense theory that the defendants merely went in to get a piece of paper and that another man, Leonardo Cisneros, was the real killer. In its order, the trial court discussed the lack of a challenge to the DNA evidence at length, identifying a variety of reasons that this claim does not merit relief. We agree with the sound reasoning of the trial court, which was primarily based on the fact that counsel's decision was an intended strategic one, and the courts will not second-guess such a decision. See Johnson v. State, 769 So.2d 990, 1001 (Fla.2000).
Gordon v. State, 863 So.2d 1215, 1220-22 (Fla.2003).
[9] As the circuit court correctly stated, McDonald's hair samples would have been inevitably obtained. The State would have had sufficient probable cause to obtain a warrant, as they did with codefendant Gordon. They then could have obtained McDonald's hair samples and compared McDonald's newly acquired hairs to the unknown hairs on the gray sweatshirt. Therefore, the hair samples would have been inevitably discovered. See Fitzpatrick v. State, 900 So.2d 495, 514 (Fla. 2005) (citing Nix v. Williams, 467 U.S. 431, 448, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984)).