976 So.2d 536 (2007)
Thomas Mitchell OVERTON, Appellant,
v.
STATE of Florida, Appellee.
Thomas Mitchell Overton, Appellant,
v.
State of Florida, Appellee.
Thomas Mitchell Overton, Petitioner,
v.
James R. McDonough, etc., Respondent.
Nos. SC04-2071, SC05-964, SC06-237.
Supreme Court of Florida.
November 29, 2007.
Rehearing Denied February 25, 2008.
*542 Neal A. Dupree, Capital Collateral Regional Counsel, Terri L. Backhus, Special Assistant CCR Counsel, and Christina L. Spudeas, Assistant CCR Counsel, Southern Region, Fort Lauderdale, FL, for Appellant/Petitioner.
Bill McCollum, Attorney General Tallahassee, Florida, and Celia A. Terenzio, Assistant Attorney General, West Palm Beach, FL, for Appellee/Respondent.
PER CURIAM.
Thomas Mitchell Overton seeks review of the denial of his motion for postconviction relief under Florida Rule of Criminal Procedure 3.851. Overton also appeals the trial court's denial of his second motion for postconviction DNA testing under Florida Rule of Criminal Procedure 3.853. Finally, Overton petitions the Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const; Fla. R.Crim. P. 3.853.

FACTUAL AND PROCEDURAL HISTORY
Overton was convicted for the first-degree murders of Susan and Michael MacIvor, for the killing of the MacIvors' unborn child, for sexual battery upon Susan, and for the burglary of the MacIvor home. See Overton v. State, 801 So.2d 877, 888 (Fla.2001). This Court detailed the facts surrounding these murders and other crimes in the direct appeal of Overton's convictions and death sentences:

*543 On August 22, 1991, Susan Michelle MacIvor, age 29, and her husband, Michael MacIvor, age 30, were found murdered in their home in Tavernier Key. . . .
. . . .
Once law enforcement officers arrived, a thorough examination of the house was undertaken. In the living room, where Michael's body was found, investigators noted that his entire head had been taped with masking tape, with the exception of his nose which was partially exposed. . . . The investigators surmised that a struggle had taken place because personal papers were scattered on the floor near a desk, and the couch and coffee table had been moved. . . .
Continuing the search toward the master bedroom, a piece of clothesline rope was found just outside the bedroom doorway. Susan's completely naked body was found on top of a white comforter. Her ankles were tied together with a belt, several layers of masking tape and clothesline rope. Her wrists were also bound together with a belt. Two belts secured her bound wrists to her ankles. Around her neck was a garrote formed by using a necktie and a black sash, which was wrapped around her neck several times. Her hair was tangled in the knot. Noticing that a dresser drawer containing belts and neckties had been pulled open, officers believed that the items used to bind and strangle Susan came from inside the home. . . . Also under the comforter was her night shirt; the buttons had been torn off with such force that the button shanks had been separated from the buttons themselves. Near the night shirt were her panties which had been cut along each side in the hip area with a sharp instrument.
. . . .
The medical examiner determined that Susan was approximately eight months pregnant at the time and proceeded to examine the fetus. The doctor determined that the baby would have been viable had he been born, and that he lived approximately thirty minutes after his mother died. The doctor testified that there was evidence that he tried to breath on his own.
. . . .
The discovery of this death scene produced a large-scale investigation, and comparable media coverage focused on the murders. Over the years following the murders, law enforcement agencies investigated several potential suspects. Through this investigatory process, Thomas Overton's name was brought up during a brain-storming session in May 1992. The reason he was considered a suspect was because he was a known cat burglar, whom police suspected in the murder of 20 year old Rachelle Surrett. At the time of the MacIvor murders, Overton worked at the Amoco gas station which was only a couple of minutes away from the MacIvor home. . . .
In June of 1993, the cuttings from the bedding were sent to the FDLE lab. . . . Through a process known as restriction fragment length polymorphism (RFLP), Dr. Pollock was able to develop a DNA profile from two of the cuttings. . . . Dr. Pollock compared the profile to samples from several potential suspects. No match was made at that time.
In late 1996, Overton, then under surveillance, was arrested during a burglary in progress. Once in custody, officers asked him to provide a blood sample, which Overton refused. Days later, Overton asked correction officers for a razor, and one was provided. Overton removed the blade from the plastic razor using a wire from a ceiling *544 vent, and made two cuts into his throat. The towel that was pressed against his throat to stop the bleeding was turned over to investigators by corrections officers. . . .
In November of 1996, over five years after the murders, Dr. Pollock was able to compare the profile extracted from the stains in the bedding to a profile developed after extracting DNA from Overton's blood. After comparing both profiles at six different loci, there was an exact match at each locus. . . .
In 1998, the cuttings from the bedding were submitted to yet another lab, the Bode Technology Group (Bode). . . . The Bode lab conducted a different DNA test, known as short tandem repeat testing (STR), from that performed by the FDLE. Overton's DNA and that extracted from a stain at the scene matched at all twelve loci.
Id. at 881-84 (footnotes omitted).
After Overton was convicted for the crimes surrounding this incident, the jury recommended the death penalty by a vote of nine to three for the murder of Susan and by a vote of eight to four for the murder of Michael. See id. at 888-89. The trial judge found the following five aggravators with regard to both victims: (1) the murders were heinous, atrocious, and cruel ("HAC"); (2) the murders were committed in a cold, calculated, and premeditated manner; (3) the defendant had a previous conviction for a violent felony (contemporaneous conviction for murder); (4) the murders were committed while Overton was committing a sexual battery and burglary; and (5) the murders were committed for the purpose of avoiding or preventing a lawful arrest. See id. at 889. The trial judge found no statutory mitigating circumstances and two nonstatutory mitigating circumstances.[1] The trial court found that "in weighing the aggravating circumstances against the mitigating circumstances, the scales of life and death tilt unquestionably to the side of death" and imposed the death sentence on Overton for each of the murders. Id. With regard to the other offenses, Overton was given a fifteen-year sentence of imprisonment for the killing of an unborn child, a life imprisonment term for the burglary, and a life imprisonment term for the sexual battery. See id.
On direct appeal, this Court considered the following claims: (1) the trial court erred in denying Overton's challenges for cause with regard to prospective jurors Russell and Heuslein; (2) the trial court erred in not compelling discovery of documents from the Bode Lab relating to the STR DNA tests and in not granting a continuance so that Overton's counsel could review these documents; (3) the trial court erred in not appointing an additional defense expert to rebut the State's evidence relating to the defense theory concerning Nonoxynol[2]; (4) the trial court erred in denying Overton's motion for mistrial after the State made statements during the rebuttal closing argument that Overton had requested only one Nonoxynol *545 test but the State had sought additional testing; (5) the trial court erred in allowing the State to improperly bolster Zientek's testimony through the alleged hearsay testimony of a prison chaplain; (6) the trial court erred in ruling that the State could elicit from Detective Visco the context from which the internal affairs complaint that Overton filed against him arose; (7) the trial court erred in finding the HAC aggravator with regard to the murder of Michael; (8) the trial court erred in not instructing the jury that it should use great caution in relying on the testimony of the informants; and (9) the trial court erred in not considering certain available mitigation that Overton chose not to present. See id. at 889-905. This Court denied all of these claims. See id. at 906. This Court also determined that sufficient evidence existed and the death sentences were proportionate. See id. at 905. Accordingly, this Court affirmed Overton's convictions and death sentences. See id. at 906.
Overton filed an initial rule 3.851 motion for postconviction relief on April 30, 2003. On October 30, 2003, Overton filed an amended motion for postconviction relief, in which he presented the following allegations: (I) access to files and records that were in possession of state agencies were improperly withheld in violation of Florida Rule of Criminal Procedure 3.852; (II) trial counsel failed to adequately investigate/prepare a case and challenge the State's case due in part to the actions of the trial court and the State; (III) the State committed Brady[3] and Giglio[4] violations and trial counsel was ineffective for the failure to present this during the trial; (IV) the State improperly used James Zientek (a jailhouse informant) as an undisclosed agent of law enforcement; (V) Overton was prejudiced by pre-indictment delay; (VI) trial counsel operated under an actual conflict of interest; (VII) an improper jury instruction with regard to expert testimony was used during trial; (VIII) the rule prohibiting attorneys from interviewing jurors prevented trial counsel from being effective; (IX) the voir dire by trial counsel was improper; (X) the combination of errors prevented a fair trial; (XI) trial counsel was ineffective for the failure to object to the introduction of time-barred offenses; and (XII) Overton's sentence was unconstitutional under Ring.[5] On March 26, 2004, a Huff[6] hearing was held. The trial court ordered an evidentiary hearing on Claims II,[7] IV, V, and VI. This Court denied a petition by Overton to delay the evidentiary hearing. On October 8, *546 2004, Overton filed a third amended motion for postconviction relief in which he presented Claim XIII, which alleged that trial counsel was ineffective for the failure to request a Richardson[8] hearing. The trial court denied an evidentiary hearing on Claim XIII. The evidentiary hearing began on November 15, 2004, and continued until November 17, 2004. On February 14, 2005, the trial court issued an order that denied postconviction relief on all of Overton's claims.
Overton also filed a motion for DNA testing on April 4, 2004, which sought the testing of several previously untested items of evidence.[9] On May 17, 2004, the trial court issued an order that denied in part and granted in part the motion for DNA testing. Although the trial court found the motion insufficient, the court granted the motion with regard to the sexual assault kit and fingernail scrapings. The trial court denied the motion with regard to the remaining evidence, finding that there was no evidence as to when the DNA evidence was deposited on those items or that the source of that DNA participated in the crime. On August 10, 2004, Overton filed a second motion that requested DNA testing of the hairs attached to the tape used to bind Susan. On August 19, 2004, the trial court denied the second motion, finding that unless the hairs were determined to belong to Overton, the results would not be relevant and could not be admitted during the trial. Additionally, the trial court found that the results of any DNA testing on the hairs would not give rise to a reasonable probability that Overton would have been exonerated or given a lesser sentence because there was no way to establish the origin of the tape or hairs, when the hairs attached to the tape, or whether there was any connection between the hairs and the crimes.
Overton filed a petition for a writ of habeas corpus with this Court on February 8, 2006. This appeal followed.

MOTION FOR POSTCONVICTION RELIEF

I. No Full and Fair Evidentiary Hearing
Overton contends that he was denied a full and fair evidentiary hearing at the postconviction stage due to the following: (1) the trial court engaged in questioning during the evidentiary hearing that functioned as questioning from a "second prosecutor"; (2) the evidentiary hearing occurred without proper discovery of the Bode Lab documents; (3) the trial court improperly denied Overton's request for additional experts to rebut the State's testing; (4) the trial court placed improper restrictions on Overton's questioning of witnesses while giving the State "free reign [sic]" to question on any topic; (5) the evidentiary hearing improperly began before all DNA testing had been completed; and (6) the trial court's denial of discovery requests for FDLE documents prevented a full and fair hearing.
The arguments with regard to the allegedly improper conduct by the trial judge at the evidentiary hearing are all procedurally barred because there was no *547 objection during the evidentiary hearing. To preserve error for appellate review, the general rule requires that a contemporaneous, specific objection occur at the time of the alleged error. See F.B. v. State, 852 So.2d 226, 229 (Fla.2003); Steinhorst v. State, 412 So.2d 332, 338 (Fla.1982). There is no indication in the record that Overton ever objected or attempted to disqualify Judge Jones due to his alleged improper conduct during the evidentiary hearing. See Schwab v. State, 814 So.2d 402, 407 (Fla.2002) (holding that the judicial bias claim was procedurally barred due to the failure to file a motion to disqualify based upon the reasoning that "where the grounds for a judicial bias claim are known at the time of the original trial, yet are not raised, such claims are waived and cannot be raised in a postconviction appeal"). For example, when the trial judge first began asking questions of witnesses during the evidentiary hearing, which Overton alleges functioned as action from a "second prosecutor," Overton's postconviction counsel failed to object. But cf. Teffeteller v. Dugger, 676 So.2d 369, 370 (Fla.1996) (addressing the merits of the due process concerns with regard to the hearing after concluding that the appellants' counsel objected to the hearing procedure). This inaction by Overton's postconviction counsel is inconsistent with Overton's current argument that Judge Jones acted as a "second prosecutor."
Even without these procedural bars, Overton's claims with regard to his failure to receive a full and fair evidentiary hearing are without merit.[10] With regard to the questioning by the trial court, which Overton contends functioned as action from a "second prosecutor," there was not any bias displayed by the trial court in favor of either the State or Overton. Instead, the court questioned witnesses to clarify certain points after both parties asked initial questions and also to gain further knowledge into background information with regard to the witnesses. As evidenced by the length of the evidentiary hearing, we conclude that the trial court's refusal to rush through the evidentiary hearing and the decision to ask questions to ensure that all pertinent information was on the record helped facilitate a full and fair hearing here. See Sims v. State, 754 So.2d 657, 666 (Fla.2000) (holding that the defendant was not deprived of a full and fair hearing on his postconviction motion by reasoning in part that the "trial court set aside several days for the hearing"). Moreover, the trial court elicited information that was clearly helpful to Overton. For example, through questioning by the trial court, Lori Figur, who was employed by Amoco at the time of the MacIvor murders, testified that she was never contacted by defense counsel Smith, Garcia, or an investigator who worked for them, which supported Overton's claim *548 that his counsel failed to adequately investigate his work alibi defense. The trial court's reliance on the responses to such questions in issuing the order that denied postconviction relief is due to the fact that (as discussed below) Overton's various claims lacked merit.
The alleged restrictions that the trial court placed on Overton's questioning of witnesses and the "free reign [sic]" given to the State to question on any topic are not supported by the record. Overton contends that despite the summary denial of the claim that his counsel was ineffective for failing to investigate the work alibi defense, the trial court still allowed the State to question witnesses on the topic. The record establishes that Overton was also allowed to elicit testimony on the topic. For example, on redirect questioning of Garcia, Overton's postconviction counsel elicited that Garcia hired an investigator to find the receipts from the Amoco station in support of the work alibi defense. Thus, contrary to Overton's argument, the trial court did not deny this particular claim twice without ever allowing Overton the opportunity to present testimony on the topic.
The claim that it was improper to begin the evidentiary hearing before all DNA testing had been completed is without merit. Overton contends that the trial court's denial of his motion for a continuance of the evidentiary hearing improperly allowed the hearing to proceed. As a general rule, a
court's ruling on a motion for continuance will only be reversed when an abuse of discretion is shown. An abuse of discretion is generally not found unless the court's ruling on the continuance results in undue prejudice to [the] defendant. This general rule is true even in death penalty cases.
Hernandez-Alberto v. State, 889 So.2d 721, 730 (Fla.2004) (quoting Israel v. State, 837 So.2d 381, 388 (Fla.2002)). The order that denied the motion for a continuance was not an abuse of discretion. The record does not support Overton's argument that the ordered DNA testing was not completed prior to the evidentiary hearing, which began on November 15, 2004. For example, at a status hearing on November 7, 2004, which was only approximately one week before the evidentiary hearing, Overton's counsel made no argument that the ordered DNA testing had not yet been completed. This is consistent with the State's argument that Overton withdrew his motion for a continuance at a status hearing on October 29, 2004. Moreover, even if the ordered DNA testing had not been completed, there was no undue prejudice to Overton. Overton has not asserted any reason why DNA testing of the crime scene swabs will produce different results than the other DNA testing, which linked Overton to the scene. Overton's argument that DNA testing of these crime scene swabs would have changed the outcome is purely speculative. See Martin v. State, 455 So.2d 370, 372 (Fla.1984) (holding that the trial court committed no abuse of discretion in denying the appointment of the defendant's requested expert as there was no undue prejudice to the defendant because the defendant's claim on the predicted effect of the expert's testimony was purely speculative).
Overton's claim that the trial court's denial of discovery requests for FDLE documents prevented a full and fair hearing is without merit. A trial court's determination with regard to a discovery request is reviewed under an abuse of discretion standard. See Reaves v. State, 942 So.2d 874, 881 (Fla.2006) ("The abuse of discretion standard of review also applies to the denial of a motion for discovery in a postconviction case." (citing State v. *549 Lewis, 656 So.2d 1248, 1250 (Fla. 1994))). Here, Overton alleges that the trial court's denial of his request for additional public records filed on September 30, 2002, before the evidentiary hearing denied him a full and fair hearing. The record establishes that those items on which the trial court denied discovery were not relevant. For example, the trial court denied the request of "any and all documents" relating to a lengthy list of FDLE employees. Only a few of these listed employees ever testified at either the trial or the evidentiary hearing. Like many of the other items that were denied, the request was unduly burdensome and overly broad. Therefore, it was certainly not an abuse of discretion for the trial court to partially deny the request for additional records from FDLE. See Moore v. State, 820 So.2d 199, 204 (Fla.2002) (discussing that a trial court has the discretion to deny public records requests that are "overly broad, of questionable relevance, and unlikely to lead to discoverable evidence").
Accordingly, the claim that Overton's due process rights were violated as a result of the failure of the trial court to provide him with a full and fair hearing is without merit.

II. Ineffective Assistance of Trial Counsel
Following the United States Supreme Court's decision in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), this Court has held that for ineffective assistance of counsel claims to be successful, two requirements must be satisfied:
First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined. A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.
Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986) (citations omitted). "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 690, 104 S.Ct. 2052. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689, 104 S.Ct. 2052. The defendant carries the burden to "overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'" id. (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). "Judicial scrutiny of counsel's performance must be highly deferential." Strickland, 466 U.S. at 689, 104 S.Ct. 2052. In Occhicone v. State, 768 So.2d 1037 (Fla.2000), this Court held that "strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Id. at 1048 (emphasis added).

A. Ineffectiveness During the Frye Hearing
Overton contends that his counsel was ineffective due to the failure to participate[11] during the Frye[12] hearing, *550 which was requested by defense counsel on December 21, 1998, and occurred on January 7, 1999. As a general rule, a frye hearing is "utilized in Florida only when the science at issue is new or novel." Branch v. State, 952 So.2d 470, 483 (Fla. 2006) (citing Brim v. State, 695 So.2d 268, 271-72 (Fla.1997)). "In utilizing the Frye test, the burden is on the proponent of the evidence to prove the general acceptance of both the underlying scientific principle and the testing procedures used to apply that principle to the facts of the case at hand." Ramirez v. State, 651 So.2d 1164, 1168 (Fla.1995) (emphasis added). With regard to the testing procedures used, DNA test results are generally accepted as reliable in the scientific community, provided that the laboratory has followed accepted testing procedures that meet the Frye test to protect against false readings and contamination. Hayes v. State, 660 So.2d 257, 264-65 (Fla.1995). In addition to the importance of the burden of proof, it is crucial that the Frye hearing be conducted in a fair manner. Ramirez, 651 So.2d at 1168.
We conclude that the limited participation of counsel during the Frye hearing did not constitute deficient performance because it was a strategic decision made by counsel. During the evidentiary hearing, both Garcia and Smith testified that they came to the mutual decision that the defense would not participate further during the Frye hearing. Counsel was of the view that they would not participate due to the lack of discovery with regard to the procedures and protocols that the Bode Lab used in testing.[13] Consistent with this belief, both Dr. Litman and Dr. Libby, who were experts hired by Overton's counsel, expressed to overton's counsel that they could not give adequate testimony if called during a Frye hearing due to the lack of discovery. Overton's counsel asked for a continuance to provide more time to prepare, but the trial court denied the request. Based upon these circumstances, it was a reasonable decision by Overton's counsel to not participate to a greater extent. The fact that counsel may not have been prepared to fully participate during the Frye hearing does not establish they were not equipped to make a strategic decision with regard to whether they should participate to a greater extent. During the evidentiary hearing, Smith testified that the defense made a strategic decision not to participate further to properly preserve the issue of the lack of discovery with regard to the Bode Lab, which could then be attacked on direct appeal. Consistent with the strategy, appellate counsel argued the discovery issue on direct appeal, but this Court found the argument to be without merit. See Overton, 801 So.2d at 895-96.
In making the strategic decision, Overton's trial counsel understood that even if they were able to prevent the STR DNA testing by the Bode Lab from being admitted into evidence, the RFLP DNA testing by the FDLE Lab would still be admitted *551 and would similarly link Overton to the crime. Prior to the Frye hearing, even the trial court acknowledged that case law established that RFLP DNA testing results would be admitted here and the Frye hearing was unnecessary on that DNA matter. Moreover, Dr. Litman previously advised Overton's counsel that RFLP DNA evidence should be admitted in this case. Overton's counsel requested the Frye hearing to challenge only the newer STR technology. Overton correctly concedes that his counsel possessed proper discovery from the FDLE Lab to challenge the RFLP testing that the FDLE Lab conducted, but, contrary to Overton's position, there was no reason to challenge the clearly admissible RFLP DNA evidence.
Moreover, despite the decision to not participate further during the Frye hearing, other attempts were made by Overton's counsel to exclude these DNA testing results. First, Overton's counsel asked that the DNA evidence be excluded and renewed the motion immediately before the Frye hearing. Second, Overton's counsel understood that the chain of custody issue would not be waived and they could still challenge witnesses during trial with regard to the alleged broken chain of custody. An alleged broken chain of custody was significant to the defense to support the defense theory that law enforcement had the opportunity to plant Overton's DNA which was found in this case. With this goal, it was reasonable for Overton's counsel to believe that an alleged broken chain of custody did not need to be addressed during the Frye hearing, but rather, should be addressed during trial. During trial, Overton's counsel thoroughly cross-examined Dr. Pope and Detective Petrick, both of whom worked for law enforcement agencies and gathered evidence from the crime scene, on the alleged broken chain of custody, which illustrated that this chain of custody issue was not waived. With regard to Pope, cross-examination on the issue included the following: (1) envelopes that were used to store DNA evidence were misdated; (2) there were no property receipts to account for the swabs that were used to obtain fluids from Susan's body at the scene; (3) the swabs were transported to his home, which was not a certified storage facility; (4) these swabs were placed in his home refrigerator; (5) the first property receipt for the envelopes of clippings, which provided a match to Overton's DNA, was dated June 10, 1994; (6) the bedding (quilt, mattress pad, comforter, and bed sheet) on which semen stains were found were placed in paper bags and transported to his home to be air dried; (7) the bedding was transported to the Key West property evidence storage room on August 26, 1991; and (8) he transported the mattress pad in a paper bag by car to Orlando to have a psychic conduct an inspection. Cross-examination of Petrick on the challenged chain of custody included the following: (1) the paper bags in which he collected evidence did not resemble the particular paper bag that allegedly had his signature on it; (2) this alleged signature on the paper bag, which read "Detective R. Petrick," was not his signature; and (3) the property receipts with regard to the clippings in envelopes had writing on them that was not his writing. Contrary to Overton's assertion that the cross-examination was insufficient, Overton's counsel attacked the alleged broken chain of custody with regard to both the brown paper bag and the envelopes that contained the clippings.
Finally, we conclude that the decision by Overton's counsel to not address a potential degradation of the DNA evidence during the Frye hearing on the basis of an alleged broken chain of custody was reasonable. First, notwithstanding that Overton's *552 counsel had not conceded at the time of the Frye hearing that the DNA evidence taken from the scene belonged to Overton, the location of DNA evidence matching Overton would be consistent with his theory that his DNA had been planted there. See McDonald v. State, 952 So.2d 484, 495 (Fla.2006) (holding that there was no ineffective assistance for failing to hire a DNA expert because the defense's theory was that the defendant's DNA was planted so "the DNA evidence would not seem to be an issue"). Second, an expert (Dr. Litman) with whom Overton's counsel consulted had dismissed the dangers of degradation and false positives from an alleged broken chain of custody here. For these reasons, the strategic decision to not participate further was a reasonable decision at the time it was made; thus, we conclude that there was no deficiency.
Even if the lack of participation by Overton's counsel during the Frye hearing was deficient, there was no prejudice for multiple reasons. First, the chain of custody was intact. When the evidentiary hearing concluded, the trial court found that "there can be no doubt that the chain of custody was absolutely intact and well documented." This finding is supported by competent, substantial evidence. See Williamson v. State, 961 So.2d 229, 237 (Fla.2007) ("This Court does not substitute its judgment for that of the trial court on issues of fact when competent, substantial evidence supports the circuit court's factual findings. . . ." (quoting Smith v. State, 931 So.2d 790, 803 (Fla. 2006), cert. denied, ___ U.S. ___, 127 S.Ct. 587, 166 L.Ed.2d 436 (2006))). The trial court specifically noted that "the Defendant uses a selective reading of the trial transcript" to contend that the chain of custody was broken. The trial court specifically found that the mystery of who signed for Detective Petrick on the paper bag was resolved because Dr. Pope testified that it was his writing. Moreover, it is not necessary that evidence be immediately catalogued with a property receipt at the police station for an intact chain of custody to exist. See Taylor v. State, 855 So.2d 1, 25-26 (Fla.2003) (concluding that a piece of evidence, which was not picked up by FDLE for two weeks but instead was stored during that time in a locked cabinet that only officers had access to, was properly admitted into evidence). Although Dr. Pope stored evidence for a period of time in his personal refrigerator at his home, he testified during trial that only he had access to this evidence in his locked home. Thus, the chain of custody was in place.
Second, even if the chain of custody was broken, there was not sufficient evidence to establish a probability of tampering, which would support exclusion of the evidence. See Murray v. State, 838 So.2d 1073, 1082 (Fla.2002) ("Relevant physical evidence is admissible unless there is an indication of probable tampering." (quoting Peek v. State, 395 So.2d 492, 495 (Fla. 1980))). Contrary to Overton's argument, this Court has not held that a broken chain of custody alone is enough by itself to establish probable tampering. See Taplis v. State, 703 So.2d 453, 454 (Fla.1997) (acknowledging that a fair reading of Dodd v. State, 537 So.2d 626 (Fla. 3d DCA 1988), is that the "State's failure to account for a gap in the chain of custody which, when considered together with the other evidence of tampering, support[s] a conclusion of probable tampering") (emphasis added). Here, there was no evidence of tampering. On direct appeal, this Court held that there was not a "scintilla" of evidence that Overton's DNA was planted. Overton, 801 So.2d at 897. Moreover, during the evidentiary hearing, multiple witnesses testified that there were no signs of significant degradation of the DNA evidence. *553 Therefore, the record does not support the contention that Overton's counsel could have established a probability of tampering, which would have arguably led to an exclusion of both the STR DNA testing and the RFLP DNA testing results, had evidence been introduced during the Frye hearing with regard to the alleged broken chain of custody.
Third, we conclude that the STR DNA testing completed at the Bode Lab meets the requirements of the Frye test. Under the first prong of the Frye test, there is strong evidence that the underlying scientific principle with STR DNA testing was generally accepted at the time of Overton's trial in 1999. See McDonald, 952 So.2d at 495-96 (holding that counsel was not ineffective for failing to request a Frye hearing because there was general acceptance in the scientific community of the particular science at issue at the time of the defendant's 1995 trial). During the Frye hearing, Dr. Bever, who was employed at the Bode Lab in 1999, testified that STR testing is "generally accepted in the scientific community as reliable." Thus, the first prong of Frye would have been fulfilled even if Overton's counsel presented a challenge. Additionally, under the second prong of the Frye test, there is strong evidence that the testing procedures actually used at the Bode Lab were sufficiently acceptable. See Ramirez, 651 So.2d at 1168. During the evidentiary hearing, Bever testified that in multiple Frye hearings in which he has presented testimony, his testimony on STR DNA testing results has never failed to meet the Frye standard. This is substantial evidence of the reliability of the STR DNA testing that has occurred at the Bode Lab. Moreover, this indicates that if Overton's counsel had attempted to challenge the STR DNA testing here, it is highly unlikely that the evidence would have been excluded. Additionally, Bever testified that the following protocols and procedures were in place at the Bode Lab when the testing for the MacIvor murders occurred: (1) Bode Lab had a quality assurance program in place; (2) Bode Lab was accredited; and (3) accreditation was based on the lab meeting certain guidelines.[14] From this testimony, the Bode Lab followed accepted testing procedures that meet the Frye test to protect against false readings and contamination. Hayes, 660 So.2d at 264-65. Thus, it is likely that a challenge to the protocols and procedures that were in place at the Bode Lab would have also been unsuccessful. Accordingly, there is no prejudice that resulted from the failure of Overton's counsel to participate more fully during the Frye hearing.[15]

*554 B. Ineffectiveness During the Guilt Phase of the Trial

1. Failure to Adequately Challenge the Jailhouse Informants
Overton contends that counsel was ineffective for the failure to adequately challenge the jailhouse informants during the guilt phase of the trial. This claim fails on the merits because we conclude that Overton's counsel did sufficiently challenge the jailhouse informants during trial. With regard to Guy Green, Smith elicited on cross-examination that Green had lied in the past to receive benefits, attempted to elicit that Green would receive benefits for the testimony here, and elicited the disciplinary problems that resulted in Green's gain time being lost. With regard to Zientek (also referred to as "Pesci"), Smith elicited the following information on cross-examination: (1) Zientek had repeatedly lied in the past; (2) Zientek was receiving a benefit to testify in this case; (3) the MacIvor case was in the newspapers at the time Zientek was in jail; (4) Overton was a "big fish" in that he had the most serious charges pending while in the jail; (5) Zientek never disclosed to Overton the true facts of his case; (6) Zientek made additional assertions to law enforcement that he did not include in his initial statement; and (7) Zientek faced significant time on serious charges (i.e., sexual battery) if his case proceeded to trial. Overton's counsel also unsuccessfully attempted to elicit that Zientek was known for entering the cells of other prisoners to view their personal documents.
With regard to the failure to reference specific issues on cross-examination, Overton's counsel possessed sound strategic reasons for not challenging the jailhouse informants on these various points. First, during the evidentiary hearing, both Smith and Garcia testified that an investigation was conducted with regard to whether anyone witnessed Zientek in Overton's cell, but nothing useful was produced by the investigation. Garcia testified that Overton provided the defense with a list of names of those who could supposedly corroborate that Zientek was in Overton's cell. After investigating all of these persons, Garcia recalled "that none of them gave us [Zientek] in the cell." Consistent with Garcia's testimony, Smith testified that none of the persons identified by Overton as individuals who supposedly saw Zientek in Overton's cell could actually make such a statement upon being deposed. Smith testified that anyone who observed Zientek in Overton's cell would have been used as a witness. In addition to being unable to state that they saw Zientek in Overton's cell, none of these people could confirm that Overton's door was left open when Overton did not occupy his cell. Additionally, Jon Ellsworth, prosecutor for the State in this case, testified that upon being deposed, none of these people could corroborate Overton's story that Zientek had access to Overton's cell. Thus, Overton's counsel was not deficient for the failure to challenge Zientek with testimony that he was seen in Overton's cell. The testimony of Overton's counsel during the evidentiary hearing establishes that this avenue of challenging Zientek was investigated and reasonably rejected as a matter of strategy due to the lack of evidence.
*555 Second, the decision of Overton's counsel to not offer themselves as witnesses (they saw Overton's cell door open during their attorney visits with Overton) to contradict the testimony of Zientek during trial that he did not have access to Overton's cell (Zientek testified that the cell door was never left open) was reasonable, rather than deficient performance. Neither Garcia nor Smith ever actually saw Zientek in Overton's cell, but instead, only saw Zientek walking around the area in which Overton's cell was located. During the evidentiary hearing, Garcia recalled Zientek's testimony during trial that he did not have access to Overton's cell, but he (Garcia) did not believe Zientek's testimony made him a witness in the case to the extent that he needed to place his name on a witness list. Garcia did not consider himself a witness because when he saw Zientek, Zientek "wasn't in the cell." Similarly, Smith testified that it never occurred to him that he should bring this to the trial court's attention. It was reasonable for Overton's counsel to conclude that because they never saw Zientek in Overton's cell, their knowledge that Overton's cell door was left open during attorney visits was fairly insignificant. Moreover, Overton's counsel elicited on cross-examination that Zientek had general access to Overton's cell due to Zientek's activities of sweeping and mopping in Cell Block A. Further, Ellsworth testified during the evidentiary hearing that he had witnesses (including several jailers who could testify that Overton's cell was always locked in accordance with the jail's rules) prepared to testify to rebut the allegation that Zientek could access Overton's cell. This would have negated any significance that the jury would have attached to any evidence that the cell door was left unlocked. See Jones v. State, 928 So.2d 1178, 1185 (Fla.2006) ("[C]ounsel cannot be deemed ineffective for failing to present evidence that would open the door to damaging cross-examination and rebuttal evidence that would counter any value that might be gained from the evidence." (quoting Johnson v. State, 921 So.2d 490, 501 (Fla.2005))).
Third, the decision of Overton's counsel to proceed no further with impeachment on Zientek's handwritten notes and the police report from which Zientek's notes appeared to have been copied directly was a reasonable strategic decision. During the evidentiary hearing, Garcia testified that a major goal of the defense was to keep from the jury the fact that Overton was a past suspect in other crimes. Consistent with this goal, Overton's counsel filed the "Motion in Limine Regarding Other Offenses" on January 20, 1999, which was granted by the trial court. Smith and Garcia decided against using this material for impeachment of Zientek because these documents also referenced uncharged and unsolved crimes for which Overton was a suspect and would have opened the door for the State to ask questions on this adverse topic. This strategy was discussed between counsel and it was also discussed with Overton. A motion in limine that was granted ensured that the jury would not learn that Overton was a convicted felon, and counsel did not want to reopen the door on the topic. Moreover, the State was prepared to go through the opened door by referencing the other crimes that appeared on these documents if Overton's counsel had used this material for impeachment. Contrary to Overton's argument, the fear of opening the door on this topic was legitimate as jury knowledge of Overton's past involvement with crimes would have negatively affected counsel's ability to defend on these more serious murder charges. Therefore, Overton's counsel was not deficient for the strategic *556 decision not to impeach Zientek in this manner. See Jones, 928 So.2d at 1185.
Fourth, the decision of Overton's counsel to not explore Zientek's relationship with Detective Daniels did not constitute deficient performance. The record supports that Zientek was not an agent of the State and also that there was a reasonable strategic reason for not questioning Zientek on his relationship with Daniels. Daniels became involved with Zientek only after the FBI contacted him (Daniels) about the fact that Zientek possessed information on the MacIvor murders. After Daniels received Zientek's statement with regard to Overton's confession, he advised Zientek to not solicit any further information from Overton. Moreover, Daniels testified that it was Zientek who initiated the contact, rather than Daniels attempting to find ways for Zientek to embellish his story (i.e., showing Zientek crime scene photos). This is inconsistent with the assertion that Zientek was an agent who worked for the State. There was also sound strategic reasoning for this decision.
Overton also contends that Zientek should have been questioned on his involvement with Daniels on other matters to illustrate that Zientek worked as an agent for the State. This mode of impeachment was considered and rejected by Smith because it would have opened the door to bolstering Zientek's testimony if the information given to Daniels in subsequent cases was corroborated by Daniels as being truthful. See Jones, 928 So.2d at 1185. For all these reasons, the decision to not further explore the alleged relationship with Daniels was not deficient performance.
Even if any of these failures were deemed to constitute deficient performance, there was no prejudice. Green provided similar testimony that supported the conviction here. See Whitfield v. State, 923 So.2d 375, 380 (Fla.2005) (holding that the failure to call certain witnesses was not ineffective assistance because witnesses already presented similar evidence and "counsel is not required to present cumulative evidence"). Overton has failed to assert specific, additional actions that could have been taken by his counsel to challenge Green.[16] Notwithstanding the challenges to Green that were in fact accomplished during trial by Overton's counsel, Green provided damaging testimony that by itself would support the conviction here. During the evidentiary hearing, the State established the existence of a prosecutable case even before discovery of Zientek as a witness. Moreover, this Court has already determined on direct appeal that any error with regard to Zientek's testimony can only constitute harmless error because other evidence identified Overton as the perpetrator, which includes the testimony of Green. See Overton, 801 So.2d at 899.

2. Failure to Investigate Alibi or Alternative Theories of the Crime
Overton contends that his counsel was ineffective for the failure to investigate alibi or alternative theories of the crime. We conclude that this claim fails on the merits. The decisions by counsel to not present a work alibi defense that Overton *557 was working at the Amoco gas station at the time of the MacIvor murders and alternative theories of the MacIvor murders were reasonable strategic decisions. The decision with regard to the work alibi defense was made only after an adequate investigation revealed that there was no evidence that Overton worked at Amoco on the night of the MacIvor murders. During the evidentiary hearing, Overton testified that he had worked at the Amoco station for just over one year at the time of the MacIvor murders in August 1991. The defense hired investigators Jeff Galler and Dave Burns to investigate the work alibi defense. Documents (timecards and receipts) that would have established whether Overton worked the night of the murders were no longer available for these investigators to review. Moreover, co-workers could not recall whether Overton worked that night. Multiple managers at Amoco at the time testified that they could not remember whether Overton worked the late shift that night, which covered from 11 p.m. to 7 a.m. A non-manager who normally worked the morning shift testified that she could not remember whether Overton worked that night. Defense counsel "considered an alibi defense, but . . . were unable to come up with specific witnesses." Additionally, Overton has not established that this evidence would have illustrated that Overton worked that night even if these witnesses had memory or if timecards had been available. See Pardo v. State, 941 So.2d 1057, 1065 (Fla.2006) (holding that the claim with regard to the failure to present an alibi was insufficiently pled because the motion did not describe how the alibi witness would have supported the alibi with exculpatory evidence (citing Jacobs v. State, 880 So.2d 548 (Fla. 2004))); Lott v. State, 931 So.2d 807, 815 (Fla.2006) (holding that the failure to investigate the alibi did not constitute ineffective assistance as there was no prejudice because the one alibi witness that was offered during the evidentiary hearing could not pinpoint the date of the conversation, so his testimony would have possessed "minimal value as alibi evidence").
Moreover, there was no prejudice from the failure to present the alibi defense because even if Overton's counsel had established that Overton was working that night, sufficient time remained for him to commit the murders. At best, the work alibi was an incomplete alibi. Susan and Michael were last seen alive at a childbirth class on August 21, 1991, which ended at about 9 p.m., and their bodies were not found until the next morning by concerned co-workers and a neighbor. See Overton, 801 So.2d at 881. It is clear that the murders could have occurred between 9 p.m. and 11 p.m. The record does not provide any support that the murders occurred after 11 p.m. Due to the location of the Amoco station being only a "couple of minutes away" from the MacIvor home, see id. at 884, Overton could have easily committed the murders and still arrived timely for his shift. Therefore, this is an additional reason that the failure to present a work alibi defense did not constitute deficient performance, and in the alternative, there also was no prejudice. See Lott, 931 So.2d at 815 (holding that the failure to investigate the alibi did not constitute ineffective assistance as there was no prejudice because "even if the jury believed that Lott did speak with Jones on the Sunday afternoon in question, it still would have left plenty of room in the twenty-seven hour timeline for Lott to have committed the murder"); Reed v. State, 875 So.2d 415, 429-30 (Fla.2004) (holding that there was not deficient performance with regard to the failure to investigate the alibi defense claim because "the available testimony provided, at best, an incomplete alibi" as the testimony still *558 allowed for a two- to three-hour window for the defendant to commit the murder).
Overton further asserts that alternative theories for the murders were not presented. The record establishes that the other leads and suspects were considered and strategically rejected by Overton's counsel. Counsel were aware of the other leads and suspects that law enforcement had pursued, but "there was nothing that [they] could come up with solid to put on" when they explored these leads and suspects. For example, counsel considered the alleged involvement of Hector Hernandez,[17] but a strategic decision was made to not explore that avenue during trial after it was discussed with Overton. In addition to their belief that the statements of Hector Hernandez were not credible, Overton's counsel recognized that the Hernandez theory also clearly placed Overton at the murder scene. This was inconsistent with the defense theory that was consistently presented at trial that Overton was not present and his DNA had been planted by law enforcement.
Overton's specific claim that an alternative theory of the murders[18] should have been presented during trial is without merit. Notwithstanding that the rationale provided by Katsnelson for this alternative theory may be argued as reasonable, there are numerous sound reasons why it was not presented by Overton's counsel. For example, Overton's counsel could have reasonably concluded that Katsnelson's opinion was not credible due to his questionable qualifications as an expert witness. Evidence of his qualifications included the following: (1) he is currently unemployed; (2) he graduated from medical school outside the United States; and (3) he has never been in the private practice of medicine in the United States. Even though Katsnelson subscribed to an alternative opinion theory, this does not support the contention that another expert in the field would have come to a similar conclusion. See Johnson v. State, 769 So.2d 990, 1005 (Fla.2000) (refusing to find ineffective assistance simply because new expert doctors had a different opinion than prior doctors, in support of court's conclusion that there had "been no showing that the attorneys' conduct was ineffective in hiring the experts or in the material furnished"). Moreover, Overton's counsel did present the expert testimony of Dr. Wright during trial, who was recommended and well known as one of the most qualified experts in the field of forensic pathology. The theory for a defense was discussed with Wright. Wright generally agreed with the conclusions of Dr. Nelms, who performed the autopsy of the MacIvors, and Overton's counsel reasonably explored all possible alternate theories of defense with Dr. *559 Wright. The testimony of Dr. Wright during the trial explored alternatives that: (1) the MacIvors could have been killed somewhere other than the house; (2) there was little evidence of a struggle at the scene; and (3) evidence existed to suggest there was more than one perpetrator. Wright rejected the opinion that Susan had not been sexually assaulted. Thus, the particular theory of Katsnelson was partially covered. See Whitfield, 923 So.2d at 381. Therefore, for all these reasons, the decision to not present the alternative theory does not constitute ineffective assistance.

3. Failure to Challenge the Burglary Charge with Regard to the Statute of Limitations
Overton further contends that the failure of his counsel to challenge the burglary charge on the basis of an expiration of the statute of limitations constituted ineffective assistance. Here, the State alleged that the burglary occurred in August 1991. Thus, assuming the statute of limitations was not extended or tolled, it would have expired in August 1995, because at the time of the incident, the limitation for a prosecution for a first-degree felony (such as the burglary charged here) was four years from the offense date. See § 775.15, Fla. Stat. (1991); Perez v. State, 545 So.2d 1357, 1358 (Fla.1989) ("[T]he limitations period in effect at the time of the incident giving rise to the criminal charges controls the time within which prosecution must be begun."). Here, the charging document was not filed until December 1996. See § 775.15(4)(a), Fla. Stat. (1991). The State contends that even if Overton's counsel had challenged the burglary charge based upon the statute of limitations, the State could have amended that charge to an armed burglary, which is a life felony, for which a prosecution could be "commenced at any time." § 775.15, Fla. Stat. (1991); § 775.087(1)(a), Fla. Stat. (1991).
This ineffective assistance claim is without merit regardless of whether the State could have amended the charging document to include the more serious burglary charge. The State did not need to include a burglary charge in this case for the trial court to find the aggravating factor of murder committed during the course of a felony. See Occhicone v. State, 570 So.2d 902, 906 (Fla.1990) ("The state need not charge and convict of felony murder or any felony in order for a court to find the aggravating factor of murder committed during the course of a felony." (citing Ruffin v. State, 397 So.2d 277 (Fla.1981))). Even without a burglary charge, the trial court would have had the basis to still find the murder during a felony aggravator here. There was clear evidence that the MacIvor murders occurred during the commission of a burglary of the MacIvor home by Overton. See Overton, 801 So.2d at 885 (discussing the testimony that "Overton had admitted to [Green] that Overton had `done a burglary at a real exclusive, wealthy, wealthy area down in the Keys,'" that Overton had admitted that "he had surveilled the house on several occasions [and] went to the home carrying a bag, which contained, among other things, a police scanner [and that] [o]ne of the first things [he] completed when he arrived was the cutting of phone wires"). This evidence of the burglary was an integral part of the description of the MacIvor murders. Therefore, even without the burglary charge, the evidence of the identical conduct would have still been presented during trial, and the trial court would have still had the basis to find the aggravator included in sentencing Overton to death. There was no prejudice.

4. Failure to Challenge the Preindictment Delay of Five Years
Overton contends that the failure of his counsel to challenge the preindictment *560 delay of five years constituted ineffective assistance. Overton has not demonstrated prejudice because the underlying claim involving preindictment delay is without merit. To possibly establish that a preindictment delay is a due process violation, the defendant must first show actual prejudice from the delay, and the court must then weigh any demonstrable reasons for the delay against the significance of the particular prejudice on a case-by-case basis. See Rivera v. State, 717 So.2d 477, 483 (Fla.1998) (citing Rogers v. State, 511 So.2d 526, 531 (Fla.1987)). If Overton's counsel had asserted a challenge based on the preindictment delay, the claim would have failed under both of the required elements.
Under the first, Overton could not establish there was actual prejudice from the delay. Even assuming alibi witnesses and Amoco timecards or receipts would have established that Overton worked the late night shift on August 21, 1991, this would only provide an incomplete alibi at best as discussed above. See Rivera, 717 So.2d at 483-84 (holding that the ineffective assistance of counsel claim for counsel's failure to present the preindictment delay issue was without merit because there was no actual prejudice to the supposed alibi defense as the now unavailable witnesses would not have provided the defendant with an alibi for the time when the murder could have occurred). With regard to Lorna Swaby[19] no longer being available as a witness, this also does not constitute actual prejudice. Contrary to Overton's argument, there is no evidence that she would have been able to provide any information involving the allegation that Detective Visco planted Overton's DNA. See Overton, 801 So.2d at 897 ("[T]he defense failed to produce a scintilla of evidence that Detective Visco planted the seminal fluids.") (emphasis added). During the evidentiary hearing, Detective Visco testified that he did not receive a used condom from Swaby and he had no knowledge that Overton's semen was planted.
Finally, Overton's argument that the delay led to degradation or contamination of the DNA evidence lacks any evidentiary support. During the evidentiary hearing, Dr. Libby testified that he could not make the determination that degradation in fact resulted with the DNA evidence here. Moreover, Dr. Bever testified that Overton's DNA was a match and those samples "did not show any significant signs of degradation." The evidence established that there were no signs of even minor degradation. Additionally, Dr. Pollock testified that degradation was not an issue here as any degradation was only a minor amount, which was insignificant to his opinion and examinations. The speculation by Overton that degradation must have occurred during the preindictment delay does not satisfy the actual prejudice requirement. See Maharaj v. State, 778 So.2d 944, 951 (Fla. 2000) (holding that the ineffective assistance claim was without merit because the conclusions to support the claim were "sheer speculation" and "[p]ostconviction relief cannot be based on speculation or possibility").
*561 Under the second element, there was justification for the delay by law enforcement. But cf. Scott v. State, 581 So.2d 887, 892-93 (Fla.1991) (holding that the preindictment delay was a due process violation because actual prejudice was shown and the State had shown "absolutely no need for any investigative delay"). During the evidentiary hearing, F.K. Jones, who was the initial lead detective for the MacIvor murders, testified that all leads were pursued. With the large number of leads and suspects that were pursued prior to the DNA match for Overton in 1996, which occurred only after Overton's failed suicide attempt provided bloody towels because he had refused earlier requests to voluntarily provide a blood sample, it is reasonable that the other leads and suspects were investigated in a diligent manner. The preindictment delay of five years was not caused by any law enforcement wrongdoing, but instead, resulted from the multiple other leads and suspects that were pursued and the time period for law enforcement (through no fault of their own) to obtain a sample of Overton's blood. Thus, a claim by Overton involving preindictment delay would have failed for this reason. Accordingly, there was no prejudice.

5. Failure to Declare a Conflict of Interest
Overton contends that the failure of his counsel to declare a conflict of interest constituted ineffective assistance. This claim is without merit. As a general rule, "the right to effective assistance of counsel encompasses the right to representation free from actual conflict." Sliney v. State, 944 So.2d 270, 279 (Fla.2006) (quoting Hunter v. State, 817 So.2d 786, 791 (Fla.2002)). To establish ineffective assistance in this situation, the defendant must demonstrate the existence of an actual conflict and that the conflict had an adverse effect upon his lawyer's representation. See Strickland, 466 U.S. at 692, 104 S.Ct. 2052; Cuyler v. Sullivan, 446 U.S. 335, 350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). Once a defendant satisfies both of these elements, prejudice is presumed. See Strickland, 466 U.S. at 692, 104 S.Ct. 2052; Cuyler, 446 U.S. at 349-50, 100 S.Ct. 1708. "To demonstrate an actual conflict, the defendant must identify specific evidence in the record that suggests that his or her interests were compromised." Sliney, 944 So.2d at 279 (quoting Hunter, 817 So.2d at 792). There is no evidence in the record that Overton's interests were compromised by any type of conflict of interest.
Contrary to Overton's arguments, nothing supports the contention that Overton's counsel improperly revealed the Nonoxynol defense theory to the State through any method, including the presentation of a book which supposedly outlined the theory. During the evidentiary hearing, Overton testified that he learned about the Nonoxynol theory while reading the book, which he then presented to his counsel. Conversely, Overton's counsel both testified that they were never given the book by Overton. Instead, they testified that the Nonoxynol theory was first brought to their attention by Dr. Wright. The testimony of Overton's counsel is corroborated by Ellsworth, who testified that neither Smith nor Garcia ever gave him the book. Instead, Ellsworth actually informed defense counsel that the Nonoxynol theory was in the book. The book was part of the State's case file only because the book belonged to Ellsworth. The record does not support Overton's assertion that an actual conflict existed; therefore, there is no need to conduct further analysis. See Wright v. State, 857 So.2d 861, 872 (Fla. 2003) (holding that the defendant failed to demonstrate ineffective assistance due to the alleged conflict of interest because the defendant failed to demonstrate a conflict *562 as nothing was presented to refute the attorney's testimony that his "loyalty was to his clients"). Accordingly, this ineffective assistance claim fails on the merits.

III. Brady Violation for Improperly Withholding Evidence
Overton contends that the State committed the following Brady violations, which prevented a full and fair evidentiary hearing: (1) failed to provide the notes from the brainstorming sessions of law enforcement in which Overton was eliminated as a suspect; (2) failed to provide the evidence that Dr. Pope's DNA work had been sloppy in other cases; (3) failed to provide evidence of three other possible suspects that were investigated by law enforcement; and (4) failed to provide pages that were missing from police reports. Generally, for a Brady violation to exist, the defendant must establish the following: "(1) the State possessed evidence favorable to the accused because it was either exculpatory or impeaching; (2) the State willfully or inadvertently suppressed the evidence; and (3) the defendant was prejudiced." Allen v. State, 854 So.2d 1255, 1259 (Fla.2003). Prejudice exists if the suppressed evidence was material. See id. at 1260. Finally, evidence is material if a reasonable probability exists that disclosure of the suppressed evidence would have led to a different result at the proceeding. See Strickler v. Greene, 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); Strickland, 466 U.S. at 694, 104 S.Ct. 2052.
The claim based on notes from police brainstorming sessions is clearly without merit. Overton was provided the Rough Notes from Profilers Meeting 05-06-92, which suggested that he be eliminated as a suspect. He contends that he should have been provided additional notes from subsequent brainstorming sessions during which he was eliminated as a suspect. Overton contends that he must have been eliminated as a suspect in a subsequent meeting because he was not arrested and charged with the MacIvor murders until 1996. Notwithstanding that some evidence exists that subsequent profiler meetings did take place (Detective Visco testified that he recalled being present for a similar type of meeting after 1992), Overton's argument that additional reports with exculpatory information were generated is based on pure speculation, which is insufficient to establish a Brady violation. See Wright, 857 So.2d at 870 (holding that there was no Brady violation because the exculpatory effect of the disputed documents was merely speculative); Gore v. State, 846 So.2d 461, 466-67 (Fla.2003) (holding that the Brady claim was insufficiently pled in the rule 3.851 motion because the defendant presented no factual basis that the disputed item ever existed or contained exculpatory information). During the evidentiary hearing, it was established that there were no further reports as Overton argues. Reports did exist with regard to two other suspects but not Overton. Unlike these other two suspects, the evidence does not support that Overton was eliminated as a suspect after the 1992 profilers' meeting. Even if elimination did occur and additional reports do exist, Overton has not provided a convincing reason why or how these reports would demonstrate that he had been eliminated as a suspect because his work alibi defense had been confirmed by law enforcement. See Carroll v. State, 815 So.2d 601, 620 (Fla.2002) ([T]he prosecution is not required to provide the defendant all information regarding its investigatory work on a particular case regardless of its relevancy or materiality.). More convincing is the testimony from law enforcement personnel that they did not investigate Overton's alleged alibi defense until much later. For *563 all these reasons, this particular Brady claim is without merit.
With regard to the alleged evidence that Dr. Pope's DNA work had been sloppy in other cases, the State is correct that there could be no prejudice with this particular Brady claim. First, the alleged evidence with regard to Pope's performance in Allen, 854 So.2d 1255, is of minimal value. Overton has not identified whether this alleged similar sloppy work occurred before or after Pope's DNA work in the instant case. Additionally, this evidence reflects only that which occurred in another case, rather than providing evidence of that which occurred in the instant case. Second, the challenges presented by Overton's counsel to Pope during trial were significant. Pope was impeached with evidence of his conduct in the instant case. Along with other forms of impeachment, Overton's counsel elicited evidence from Pope that he transported pieces of evidence to his home and placed evidence in his household refrigerator, which is not certified as a storage facility or lab. This evidence did impeach Pope, and the alleged evidence of similar sloppy work in another case would be cumulative. See Ponticelli v. State, 941 So.2d 1073, 1086-87 (Fla.2006) (holding that the alleged Brady material was merely cumulative to the significant impeachment that already occurred during trial, so there was no prejudice for a Brady violation); Guzman v. State, 868 So.2d 498, 508 (Fla.2003) (concluding that there was no prejudice under Brady because with the significant impeachment evidence that was presented during trial, evidence of the reward given to the witness by the State would have been merely cumulative). Therefore, this particular Brady claim is also without merit.
The claim based on alleged evidence of three other possible suspects also fails on the merits. The record refutes Overton's argument that information on Hector Hernandez was not disclosed to his counsel. Overton's counsel testified that he was given the information about Hernandez. Consistent with that testimony, Ellsworth testified that he advised Overton's counsel about Hernandez as a suspect upon his receipt of the information. Moreover, the information was actually inculpatory rather than exculpatory. These statements from Hernandez would establish that he was at the murder scene while Overton was murdering the MacIvors. Overton's counsel clearly did not want to pursue the alleged involvement of Hernandez because it would place Overton at the scene, which was totally inconsistent with the defense theory that Overton was not at the scene and that his DNA had been planted.
Overton fails to include names of other suspects allegedly concealed. Due to law enforcement's investigation of multiple suspects here, the failure to include identification of which suspects were allegedly not disclosed constitutes an insufficient pleading. See Gore, 846 So.2d at 466-67. Even if this sub-issue had been sufficiently pled, it is without merit as the record illustrates that nothing fruitful resulted from law enforcement's investigation into other suspects. See Wright, 857 So.2d at 870 (holding that the information contained in the police files with regard to other possible suspects was not Brady material).
The Brady claim as to missing pages from police reports is also insufficiently pled as Overton does not present any information as to what these pages included or how such would be exculpatory. See Gore, 846 So.2d at 466-67 (holding that the defendant insufficiently pled the Brady claim because he failed to assert how the evidence was material or how he was prejudiced by the State's nondisclosure). *564 The fact that alleged missing pages were from a police report is not sufficient in itself to require relief. See Carroll, 815 So.2d at 620.

IV. Improper Summary Denial of Several Claims
Overton contends that the trial court improperly "picked and chose" the issues upon which to grant an evidentiary hearing by summarily denying several claims. As a general rule, when this Court reviews the summary denial of a claim raised in a rule 3.851 motion, "this Court accepts the movant's factual allegations as true, and we will affirm the ruling only if the filings show that the movant has failed to state a facially sufficient claim or that there is no issue of material fact to be determined." Booker v. State, 969 So.2d 186, 195 (Fla. 2007).
Overton's evidentiary hearing claim that postconviction counsel was denied access to public records from various agencies is without merit. This claim was exhaustively argued in the trial court on January 14, 2003, and no further evidentiary hearing before the same trial court was necessary. Thus, there was no issue of material fact to be determined. Generally, an abuse of discretion standard is applied to review a court's denial of a public records request. See Hill v. State, 921 So.2d 579, 584 (Fla.), cert. denied, 546 U.S. 1219, 126 S.Ct. 1441, 164 L.Ed.2d 141 (2006). Additionally, [d]iscretion is abused only when the judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable person would take the view adopted by the trial court. Parker v. State, 904 So.2d 370, 379 (Fla.2005) (quoting State v. Coney, 845 So.2d 120, 137 (Fla.2003)). In denying the request here, the trial court specifically found that the requests were not "reasonably calculated to lead to the discovery of admissible evidence" and were "overly broad and unduly burdensome." The record fully supports the trial court's finding with regard to the denial of these overly broad requests. It was reasonable to limit discovery of public records to those pertaining to the investigation of the MacIvor murders, rather than any investigation in which Overton had ever been involved, so such was certainly not an abuse of discretion. See Moore v. State, 820 So.2d 199, 204 (Fla. 2002) (recognizing that a trial court has the discretion to deny public records requests that are "overly broad, of questionable relevance, and unlikely to lead to discoverable evidence"); Glock v. Moore, 776 So.2d 243, 253 (Fla.2001) (explaining that the production of public records for capital postconviction proceedings is "not intended to be a procedure authorizing a fishing expedition for records unrelated to a colorable claim for postconviction relief (quoting Sims v. State, 753 So.2d 66, 70 (Fla. 2000))).
In a similar manner, the summary denial of other ineffective assistance claims in Claim II was correct. The allegations of counsels failure to utilize experts in crime scene investigation is refuted by the fact that extensive testimony on crime scene investigation matters did occur. During trial, Dr. Wright testified that it was possible that the murders were committed elsewhere and there could have been more than one perpetrator. Thus, the claim was legally insufficient on its face.
Allegations directed to counsel's failure to utilize an expert for additional testing of Nonoxynol[20] were also properly denied because *565 the trial court was correct in concluding that the claim was procedurally barred because it already had been decided. On direct appeal, this Court held that the trial court did not err by failing to appoint an additional defense expert to rebut the State's theory of Nonoxynol in the bedding. See Overton, 801 So.2d at 896-97. This Court reasoned that there was no need for an additional expert and there was also no prejudice. See id. at 897. Overton cannot relitigate this same issue disguised as ineffective assistance of counsel. See Teffeteller v. Dugger, 734 So.2d 1009, 1023 (Fla.1999) ([A]llegations of ineffective assistance of counsel cannot be used to circumvent the rule that postconviction proceedings cannot serve as a second appeal. (citing Medina v. State, 573 So.2d 293, 295 (Fla.1990))). Thus, this claim was legally insufficient on its face.
Allegations of counsel's failure to properly prepare for trial, which allegedly produced inadequate cross-examination of both Detective Petrick with regard to partial palm prints on the metal pipe and Dr. Nelms on alternative theories of the crime, are also baseless and summary denial was proper. First, Overton's counsel did properly challenge Petrick's statement that he did not know if the partial palm prints were compared to Overton by eliciting direct evidence from other witnesses that a comparison did occur and there was no match. Detective Daniels testified that the partial palm prints did not match with those of Overton. Second, Overton's counsel did properly address the testimony of Dr. Nelms by presenting Dr. Wright as a defense expert. Wright expressed the opinion that it was possible that the murders occurred elsewhere and that there was more than one perpetrator. Thus, these claims were legally insufficient on their face.
Contrary to Overton's arguments, an evidentiary hearing was in fact granted on the allegations in paragraph 34 of the petition directed to counsels failure to promptly investigate work alibi witnesses. In addition to the court's order reflecting that an evidentiary hearing was granted, there were numerous witnesses presented during the evidentiary hearing who were extensively questioned on the issue of a possible work alibi defense and whether Overton's counsel pursued the theory.
The challenge to counsel's failure to present evidence of harassment of Overton by the Monroe County Sheriff's Office[21] was also properly summarily denied. The trial court was correct in concluding that pursuit of the theory would have opened the door to the fact that Overton was a suspect in many unsolved crimes, which Overton's counsel attempted to avoid as evidenced by the motion in limine they filed. The claim was facially invalid. Similarly, other paragraphs which assert that counsel improperly failed to impeach Detective Visco with Overton's statements from the Rachelle Surrett homicide investigation were also properly summarily denied because this would have opened the door to the fact that Overton was a suspect in the unsolved crime involving Surrett.
Denial of Claim III, which alleged that the State committed a Brady violation by not providing notes from police profiler brainstorming sessions and documentation of the sloppy collection techniques of Dr. *566 Pope in other cases, was also correct. As discussed above, Overton's claim that the State did not provide notes from brainstorming sessions is insufficiently pled because it is based on pure speculation. See Gore, 846 So.2d at 466-67. Additionally, as discussed above, Overton's claim that the State should have provided documentation of Dr. Pope's sloppy collection techniques clearly could not meet the prejudice requirement under Brady. Thus, these two issues were legally insufficient on their face.
Claim VII, which alleged that Overton's counsel was ineffective for the failure to object to the jury instruction on the testimony of expert witnesses, was correctly denied as facially invalid. During the Huff hearing, Overton's counsel stipulated that this particular jury instruction was the standard expert jury instruction and that this legal issue could be determined without an evidentiary hearing. Failure to object to a standard jury instruction is not ineffective assistance here. See Elledge v. State, 911 So.2d 57, 77 (Fla. 2005); Thompson v. State, 759 So.2d 650, 665 (Fla.2000) (holding that it was not deficient for counsel to fail to object to a standard instruction that had not been invalidated by this Court).
Claim VIII, directed to a lack of effective assistance due to a rule of professional conduct that prevents the interviewing of jurors, has no merit and was facially invalid. During the Huff hearing, Overton's counsel stipulated that this was the particular rule in place and that this was a purely legal issue. The claim is procedurally barred because it could have been asserted on direct appeal and is now being couched in terms of ineffective assistance. See Arbelaez v. State, 775 So.2d 909, 920 (Fla.2000) (holding that the claim of not being able to interview jurors was procedurally barred because the claim should and could have been raised on direct appeal). Moreover, this Court has previously determined that this type of claim is without merit. See id. (holding that the claim of not being able to interview jurors is without merit when the goal is to be able to conduct fishing expedition interviews with jurors after they return a guilty verdict).
Claim IX, which alleged ineffectiveness during voir dire, was insufficiently pled to the trial court. Overton advanced only conclusory arguments that because the jury was not sequestered and his motion to change venue was denied, counsel must have been ineffective during voir dire. See Bryant v. State, 901 So.2d 810, 821-22 (Fla.2005) (holding that a 3.851 claim of ineffective assistance was legally insufficient where the motion did not allege the specific facts to which the witness would testify and how the lack of testimony prejudiced the case).
Claim X, asserting cumulative error, was properly denied. As we have explained, all of Overton's claims of error have been rejected which renders this cumulative error claim moot. See Marshall v. State, 854 So.2d 1235, 1252 (Fla.2003) (holding that the claim of cumulative error was rendered moot because all claims were rejected but one, for which an evidentiary hearing would occur on remand).
Claim XI, directed to a lack of effective assistance due to a failure to object to the introduction of time-barred offenses (the burglary charge), and Claim XII, which claimed that Overton's death sentences were unconstitutional under Ring, were both properly denied without an evidentiary hearing. Overton's postconviction counsel conceded that these were purely legal issues that did not require an evidentiary hearing. Moreover, as previously developed, no prejudice resulted from the introduction of the burglary charge, which the *567 trial court correctly recognized in denying the evidentiary hearing. Additionally, the claim that Overton's death sentences violated Ring was clearly without merit because this Court has previously held that Ring cannot receive retroactive application. See Johnson v. State, 904 So.2d 400, 412 (Fla.2005) (holding that Ring does not apply retroactively in Florida postconviction proceedings to cases that were final on direct review at the time of the Ring decision). Thus, these claims were legally insufficient on their face.
Relief cannot be granted on Claim XIII. This claim concerning a Richardson hearing has been insufficiently presented in Overton's brief to this Court because it is merely listed with no corresponding argument. See Darling v. State, 966 So.2d 366, 382 (Fla.2007) ([T]his claim is denied as insufficiently pled because Darling alleges no additional facts or circumstances revealed by these additional materials that would require leave to amend the 3.851 motion.).

MOTION FOR POSTCONVICTION DNA TESTING
Overton contends that the trial court erred in the partial denial of the motion which requested DNA testing of the hairs attached to the tape used to bind Susan. As a general rule, Florida Rule of Criminal Procedure 3.853(c)(5) provides:
(5) The court shall make the following findings when ruling on the motion:
. . . .
(B) Whether the results of DNA testing of that physical evidence likely would be admissible at trial. . . . (C) Whether there is a reasonable probability that the movant would have been acquitted or would have received a lesser sentence if the DNA evidence had been admitted at trial.
Fla. R.Crim. P. 3.853(c)(5)(B)-(C). In the order denying relief with regard to the second motion for DNA testing, the trial court found:
b. In terms of admissibility at trial of the results of the DNA testing in question, there appears to exist reliable proof to establish authenticity and a chain of custody. However, in terms of relevance, unless the results showed the hairs to be those of the Defendant, the results would not be relevant and hence, not admissible.
c. If the DNA evidence had been admitted at trial, there is no reasonable probability that the Defendant would have been acquitted or would have received a lesser sentence.
The trial court also noted:
[E]ven assuming that the source of the hairs in question is a person other than the Defendant or one of the victims, that information is of no consequence. First of all, there is no way to determine where the tape itself came from, that is, was it in the MacIvor's residence before the break-in or was it brought to the crime scene by the perpetrator? Secondly, the fact of the matter is that tape is a sticky substance which can easily pick-up a few strands of hairs in a variety of ways and from a variety of sources. For example, the pieces of hair in question could have been on the tape prior to commission of the crimes, or the pieces of hair could have been left in the MacIvor residence weeks, months, or even years before the crimes by a legitimate guest and then picked up by the tape at the time of the crimes. In view of the fact that it is impossible to establish when and how the pieces of hair became attached to the tape, DNA testing is of no use or significance.
We agree with the trial court and deny relief as we more fully explain.

*568 I. The Admissibility of the Evidence
Overton contends that it was error to find that DNA test results of the hairs on the tape would only be admissible if the hairs belonged to Overton. He reasons that if DNA testing revealed that the hairs came from someone other than the victims and not from him, the results would prove the identity of the true perpetrator and disprove that he was at the crime scene. He asserts this would constitute relevant admissible evidence. As the trial court correctly noted, evidence that the hairs came from someone other than Overton or the victims would fail to prove or disprove any theory in this case because it is impossible to establish when or how the hairs may have become attached to the tape.
In an effort to provide the requisite nexus to link the hairs to the crime, Overton contends that the hair became attached to the unwrapped tape only as it was being used to bind the victim's ankles and contends that the decision on direct appeal establishes that the tape came from inside the home. Although the decision of this Court on direct appeal states that the "officers believed that the items used to bind and strangle Susan came from inside the home," Overton, 801 So.2d at 882, the observation refers to and directly follows the discussion of how the items used to bind Susan included a belt, necktie, and black sash, and that the officers noticed an open drawer in the bedroom which contained belts and ties. Nothing in this statement or elsewhere in the opinion states or even implies that this belief extended to the clothesline rope or masking tape that was also involved. Additionally, and contrary to the assertions of Overton, evidence that the tape came from inside the home would strengthen the argument that the hairs could have been left by a legitimate guest at sometime prior to the murders and had become attached to the tape as it was being used, handled, and stored inside the residence.
Regardless of where the tape originated, Overton's assertion that the hair adhered to the tape only as fresh layers of tape were unwrapped from the roll does not establish the requisite nexus between the hair and the crime. Even if the hair adhered to a section of freshly unwrapped tape, that fact does not establish the source of the hair or the timing of placement within the home. The hair could have easily originated from a large number of sources, including the carpet, comforter, victim's nightshirt, or any of the items thought to have been emptied from her purse which were discovered under the comforter upon which her body was found. See id. Likewise, the hair could have attached on contact with the belt or clothesline rope that were also used to bind Susan. See id. Thus, the conclusory assertion that if the hair does not belong to Overton or the victims, it must belong to a person who committed or participated in the crime, is far too tenuous because there is no way to determine when, why, where, or how the hairs attached to the tape. This assertion is the type of speculation that this Court has found to be a basis for denying a rule 3.853 motion. See Lott, 931 So.2d at 821 (holding that the defendant "embarked on a fishing expedition for genetic material whose . . . potential relevance is pure conjecture," and that the defendant could not "obtain DNA testing based on the speculative allegations in his motion"); Hitchcock v. State, 866 So.2d 23, 26 (Fla.2004) (speculative claims cannot form the basis of granting a motion for postconviction DNA testing).
Based on the foregoing, the trial court correctly determined that the rule 3.853 motion failed to demonstrate that the *569 DNA evidence sought by Overton would have been admissible during the trial.

II. Reasonable Probability of Acquittal or Lesser Sentence
The rationale with regard to the admissibility of the test results is also applicable with regard to the analysis of whether the DNA evidence would have given rise to the reasonable probability that Overton would have been exonerated or received a lesser sentence had the evidence been introduced during trial. Florida courts have repeatedly denied motions for the DNA testing of hair where the time and manner in which the hair was deposited at the crime scene or on a piece of evidence is unknown. See King v. State, 808 So.2d 1237 (Fla. 2002) (upholding the trial court's finding that the defendant could not meet the requisite showing that DNA testing of hair would give rise to a reasonable probability that he would be acquitted or receive a reduced sentence because it was impossible to determine when, where, or how hair transferred to the victim's nightgown); see also Hitchcock, 866 So.2d 23 (affirming the trial court's denial of the motion for DNA testing of hairs where the defendant, victim, and person that the defendant alleged was the perpetrator all lived in the same home; hairs from all three would have been deposited throughout the home; and proof that the hair was not the defendant's would not establish that the defendant was not at the crime scene or did not commit the murder); Tompkins v. State, 872 So.2d 230 (Fla.2003) (affirming the trial court's denial of the motion for DNA testing of hairs because the hairs were unreliably contaminated due to the location of the victim's remains in a shallow grave); Galloway v. State, 802 So.2d 1173 (Fla. 1st DCA 2001) (affirming the trial court's denial of the motion for DNA testing because a mere allegation that the DNA of the defendant would not match DNA evidence was insufficient to establish that the defendant was not present and a coparticipant in the crime). Overton's attempt to distinguish this precedent is unavailing. He contends that, unlike King, in which the hair was found on a victim who crawled from a burning bedroom and was later dragged out of her burning house, the hair on the tape bindings here was found on a person who was bound and immobilized inside her home and the hair adhered to the tape during the binding. Even assuming that the hair did attach to the tape during the binding, Overton, like King, cannot satisfy the statutory requirement that the testing of the hair would give rise to a reasonable probability that he would be acquitted or receive a lesser sentence because there is no way to determine when, why, where, or how the hair was deposited in the MacIvor residence.
Overton argues that because, unlike Galloway, the State here did not assert or prove that there were multiple perpetrators, DNA testing of the hair would prove that there was an additional participant in the sexual battery and murder of Susan, which would give rise to the reasonable probability that Overton would have received a reduced sentence. However, contrary to this assertion, the decision of the First District Court of Appeal in Galloway was based on the fact that even if testing of the evidence obtained from the crime scene demonstrated that the DNA did not match the defendant, it would not prove that the defendant was not present at the crime scene or a participant in the crime. See Galloway, 802 So.2d at 1175 (citing People v. Pugh, 288 A.D.2d 634, 732 N.Y.S.2d 673, 674 (N.Y.App.Div.2001) ("[U]pholding denial of postconviction DNA testing in single assailant rape case on grounds that `the absence of defendant's semen on the tested material . . . would not have exonerated or tended to *570 exonerate defendant.'")). Likewise, even if the testing of the hair here reveals it did not come from Overton or the victims, the results will not exonerate Overton or mitigate his sentence because such results would not prove that Overton was neither the perpetrator nor present at the crime scene.
Overton asserts that there was no evidence other than the allegedly unreliable DNA test results that linked him to the crime in the instant case and that the trial court impermissibly relied on this evidence in denying the instant motion. However, the trial court based its determination that testing of the hair would be inconsequential to proving or disproving any material fact upon the impossibility of determining how, when, where, or why the hair was deposited in the MacIvors' residence.[22] Moreover, and contrary to Overton's argument, this Court has already acknowledged the importance of the direct testimony in linking Overton to the crime, which is completely independent of DNA testing. See Overton, 801 So.2d at 899.
Based on the foregoing, the trial court correctly found that the rule 3.853 motion failed to assert a reasonable probability that the requested testing would exonerate Overton or lessen his sentence.

III. Evidence From the Record
Overton contends that the trial court was required to specify evidence in the record that conclusively demonstrates he is not entitled to relief, and he relies on Ortiz v. State, 884 So.2d 70 (Fla. 2d DCA 2004), to support this position. In Ortiz, the Second District noted that a 3.853 motion cannot be summarily denied unless the record conclusively demonstrates that the appellant is entitled to no relief. See id. at 71. Contrary to the assertions of Overton, the trial court did identify evidence in the record that conclusively demonstrates that Overton is not entitled to relief. The trial court specifically noted that it is unknown where the tape here came from and when the hair may have become attached to the tape. With this crime occurring in a residence, the trial court also noted that, as a practical matter, hair can be left behind by any person who may enter a residence and it would be impossible to determine when the hair was deposited in the MacIvor residence. See Overton, 801 So.2d at 881. Thus, DNA testing would not establish that the person whose DNA matched the hair had any connection with this crime. Additionally, it was demonstrated during the trial that the hair did not visually match Overton or the victims; thus, the record demonstrates that the fact that the hair did not come from Overton had no bearing on Overton's death sentences. Unlike the appellant in Ortiz, the trial court here indicated which portions of the record conclusively demonstrate that Overton is not entitled to relief.

IV. Entitlement to an Evidentiary Hearing
Finally, Overton contends that the trial court should have held an evidentiary hearing to determine the type of trace evidence that could be picked up by tape, the type of evidence that could be recovered from the tape, the condition of the tape, and where it was found. Florida courts have required evidentiary hearings in 3.853 proceedings only when there is *571 some disputed factual issue. See Jordan v. State, 950 So.2d 442 (Fla. 3d DCA 2007) (whether it is scientifically possible to develop a DNA profile of assailant whom the victim scratched); Hampton v. State, 924 So.2d 34 (Fla. 3d DCA 2006) (whether it is scientifically possible to generate DNA profiles of all three assailants from one sample); Carter v. State, 913 So.2d 701, 702 (Fla. 3d DCA 2005) ("Where a defendant claims that DNA evidence exists, but the state denies the claim, a factual dispute results and an evidentiary hearing is required."); Thompson v. State, 922 So.2d 383, 383 (Fla. 2d DCA 2006) ("A decision by the postconviction court that DNA evidence does or does not exist is a factual finding and requires an evidentiary hearing."). In the instant case, there was no factual dispute with regard to the existence of the hair on the tape or whether a DNA profile could be developed. Thus, the assertions made by Overton are without merit and do not warrant an evidentiary hearing because information with regard to the type of trace evidence that could be picked up by tape, the type of evidence that could be recovered from the tape, the condition of the tape, and where it was found would not demonstrate when, why, where, or how the hair attached to the tape. With this predicate, and as the trial court found, the requested testing of the hair samples would not have proved or disproved a material fact and would not have exonerated Overton or lessened his sentence.

PETITION FOR WRIT OF HABEAS CORPUS

I. Ineffective Assistance of Appellate Counsel
As a general rule, claims of ineffective assistance of appellate counsel are presented in a petition for writ of habeas corpus. See Freeman v. State, 761 So.2d 1055, 1069 (Fla.2000). Consistent with the Strickland standard, to grant habeas relief based on ineffectiveness of counsel, this Court must determine the following:
[F]irst, whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.
Pope v. Wainwright, 496 So.2d 798, 800 (Fla.1986); see also Freeman, 761 So.2d at 1069; Thompson v. State, 759 So.2d 650, 660 (Fla.2000). In raising such a claim, "[t]he defendant has the burden of alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based." Freeman, 761 So.2d at 1069; see also Knight v. State, 394 So.2d 997, 1001 (Fla.1981). "If a legal issue `would in all probability have been found to be without merit' had counsel raised the issue on direct appeal, the failure of appellate counsel to raise the meritless issue will not render appellate counsel's performance ineffective." Rutherford v. Moore, 774 So.2d 637, 643 (Fla. 2000) (quoting Williamson v. Dugger, 651 So.2d 84, 86 (Fla.1994)).

A. Failure to Challenge the Denial of the Motion to Change Venue
Overton contends that his appellate counsel was ineffective for the failure to present on appeal the improper denial of his motion to change venue. The record clearly establishes that Overton's trial counsel requested a change of venue due to alleged pretrial publicity. Generally, to determine a change of venue, the test is:

*572 [W]hether the general state of mind of the inhabitants of a community is so infected by knowledge of the incident and accompanying prejudice, bias, and preconceived opinions that jurors could not possibly put these matters out of their minds and try the case solely on the evidence presented in the courtroom.
Rolling v. State, 695 So.2d 278, 284 (Fla. 1997) (quoting McCaskill v. State, 344 So.2d 1276, 1278 (Fla.1977)). In ruling on a motion for a change of venue, the trial court should consider the following: (1) the extent and nature of any pretrial publicity; and (2) the difficulty encountered in actually selecting a jury. Rolling, 695 So.2d at 285. The ability to seat an impartial jury in a high-profile case may be demonstrated by either a lack of extrinsic knowledge among members of the venire or, assuming such knowledge, a lack of partiality. Id. (citing Oats v. State, 446 So.2d 90, 93 (Fla.1984)). Moreover, the existence of pretrial publicity does not necessarily require a change of venue, but instead, pretrial publicity should be examined in light of the following factors: (1) when the publicity occurred in relation to the time of the crime and the trial; (2) whether the publicity was made up of factual or inflammatory stories; (3) whether the publicity favored the prosecutions side of the story; (4) the size of the community exposed to the publicity; and (5) whether the defendant exhausted all of his peremptory challenges in seating the jury. State v. Knight, 866 So.2d 1195, 1209 (Fla.2003). Finally, a trial court's failure to grant a motion for a change of venue is reviewed under an abuse of discretion standard. See Rivera v. State, 859 So.2d 495, 511 (Fla.2003). Here, the underlying claim that the trial court erred in its denial of Overton's motion to change venue is without merit because we conclude that under the two-prong test to evaluate that ruling, the trial court's denial of the motion was not an abuse of discretion. Thus, appellate counsel was not ineffective for the failure to assert this issue on direct appeal.

1. Extent and Nature of Any Pretrial Publicity
With the pretrial publicity here, the record does not establish that the jurors could not possibly "put these matters out of their minds." Rolling, 695 So.2d at 284. First, the publicity consisted of largely factual articles, rather than inflammatory stories.[23] The factual information in newspaper articles included the following: (1) Overton was indicted in the MacIvor killings, and the charges he faced were listed; (2) people who knew Overton were shocked to discover the charges he faced based upon their past positive dealings with him; (3) Overton's DNA did not match with other unsolved murders; (4) a new judge (Judge Jones) was appointed in the case; (5) advertisements were placed on billboards to gather potential leads in the case; (6) an ailing witness was allowed to have his testimony perpetuated in Pennsylvania; (7) Overton denied involvement in the MacIvor murders; (8) Overton considered whether to act as his own lawyer; (9) defense counsel requested that DNA evidence be excluded; (10) Overton claimed to be a victim of a police plot and would prove such through the Nonoxynol theory; and (11) details of the funeral services for the MacIvors.
*573 Conversely, the material did contain some inflammatory items including: (1) many of the stories did mention Overton's past criminal activity as a burglar; (2) a description that Overton "[had] been in trouble since he was a youngster"; (3) a description that Overton was institutionalized for mental health problems in the past; and (4) the DNA results established that there was a one-in-six-billion chance that anyone but Overton committed the crime. Notwithstanding some inflammatory matters, it was reasonable for the trial court to conclude that the pretrial publicity was largely factual, rather than inflammatory. See Rolling, 695 So.2d at 284 (holding that notwithstanding that the "case generated massive pretrial publicity," a motion to change venue was not improperly denied as such pretrial publicity was not "presumptively prejudicial because it consisted of `straight news stories,' relating `cold, hard facts'"). Second, much of this largely factual information was even beneficial to Overton. For example, one newspaper article illustrated that Overton's DNA did not match with the DNA evidence from other unsolved murders. Thus, it was reasonable for the trial court to conclude that the pretrial publicity did not completely favor the prosecution's version of the case. Accordingly, these factors do not support the assertion that the trial court abused its discretion in denying the motion to change venue.

2. Difficulty Encountered in Actually Selecting a Jury
Notwithstanding that some pretrial publicity did exist here, the record establishes that the jurors were not so infected that they could not possibly "put these matters out of their minds." Rolling, 695 So.2d at 284; see Knight, 866 So.2d at 1209 (holding that there was no abuse of discretion for denying the motion to change venue because although there had been some publicity surrounding the murder, "an independent review of the record demonstrates that there was no difficulty in seating the jury"). During voir dire, most of the prospective jurors assured the trial court that they could be impartial despite any extrinsic knowledge. Overton does not provide any reason why this demonstrated jury impartiality has been rebutted. See Rolling, 695 So.2d at 286 (discussing that although not dispositive, assurances from prospective jurors that they are impartial despite their extrinsic knowledge support the presumption of a jury's impartiality). Moreover, Overton does not and cannot contend that any of the prospective jurors who stated they could not be impartial due to their extrinsic knowledge actually entered the jury box as a member of the venire. Instead, it appears from the record that the trial court was able to obtain a jury of impartial jurors from an even greater pool of prospective jurors who confirmed that they could be impartial. Thus, there is no established prejudice that resulted from any of the pretrial publicity.[24]See Rivera, 859 So.2d at 511 (holding that there was no ineffective assistance due to appellate counsel's failure to challenge the trial court's denial of the motion to change venue because the defendant failed to show actual prejudice). It is reasonable to conclude that the selection of the venire *574 was not such a difficult process that it reflected a "pervasive community bias" against Overton. Rolling, 695 So.2d at 287. Accordingly, this certainly does not support Overton's argument that an abuse of discretion occurred under the second prong, which analyzes any difficulty encountered in the actual selection of a jury. In conclusion, appellate counsel was not ineffective for the failure to challenge the trial court's denial of the motion to change venue because had it been presented, the claim would have likely been found to have no merit.
B. Failure to Challenge the Denial of the Motion to Exclude DNA Evidence Based on a Break in the Chain of Custody
Overton argues that his appellate counsel was ineffective for the failure to challenge the denial of the motion to exclude DNA evidence based upon a break in the chain of custody. The claim is procedurally barred. Overton made the motion to exclude the DNA evidence only in the alternative if his motion to compel (and his corresponding motion to continue to allow time to review the documents) the production of the Bode Lab documents was denied. Although Overton did ask the trial court to exclude the DNA evidence, this request was made in the context of his request to have Bode Lab documents produced so he could challenge at the Frye hearing the testing that was used (i.e., the protocols and procedures) under the second prong of the Frye test. As presented to the trial court, the motion to exclude was based upon the alleged faulty protocols or procedures, rather than an alleged broken chain of custody that Overton now asserts. The trial court was not presented with the specific argument that the DNA evidence should be excluded due to an alleged broken chain of custody. To preserve error for appellate review, the general rule is a contemporaneous, specific objection must occur during trial at the time of the alleged error. See F.B., 852 So.2d at 229; Steinhorst, 412 So.2d at 338. Thus, the claim is procedurally barred.
Even if this claim did not have a procedural bar, the claim is without merit. Overton's appellate counsel was not ineffective here because the underlying claim itself is without merit. Even if the claim had been asserted, this Court would not have concluded that the chain of custody was broken because as previously analyzed, the chain of custody here was intact. Moreover, even if this Court had concluded that the chain of custody had been broken, the trial court's denial of the motion to exclude would not have been reversed. A broken chain of custody is not enough by itself to establish the probability of tampering, which would require the exclusion of evidence. See Taplis, 703 So.2d at 454. Instead, there must be other evidence of tampering. See id. Here, there was no other evidence of tampering. On direct appeal, this Court held that there was not a "scintilla" of evidence that there was any planting of Overton's DNA. Overton, 801 So.2d at 897. Additionally, the record refutes the allegations that there was harmful degradation to the DNA evidence. Multiple witnesses testified during the evidentiary hearing that there were no signs of significant degradation to the DNA evidence. Therefore, this Court would have in all probability found the underlying claim to be without merit for multiple reasons and appellate counsel was not ineffective for the failure to present this claim.

II. Ring and Apprendi Violations with Death Penalty Statute
Overton contends that his sentences of death must be vacated because Florida's capital sentencing scheme is a violation of both Ring and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, *575 147 L.Ed.2d 435 (2000). The claim is without merit. This Court addressed the contention that Florida's capital sentencing scheme violates the United States Constitution under Apprendi and Ring in Bottoson v. Moore, 833 So.2d 693 (Fla.), cert. denied, 537 U.S. 1070, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002), and King v. Moore, 831 So.2d 143 (Fla.), cert. denied, 537 U.S. 1067, 123 S.Ct. 657, 154 L.Ed.2d 556 (2002), and denied relief. See also Jones v. State, 845 So.2d 55, 74 (Fla.2003). Overton is likewise not entitled to relief on this claim. Furthermore, one of the aggravating circumstances found by the trial court here was Overton's previous conviction of a violent felony, "a factor which under Apprendi and Ring need not be found by the jury." Jones v. State, 855 So.2d 611, 619 (Fla.2003); see also Doorbal v. State, 837 So.2d 940, 963 (Fla.) (rejecting the Ring claim where one of the aggravating circumstances found by the trial judge was defendant's prior conviction for a violent felony), cert. denied, 539 U.S. 962, 123 S.Ct. 2647, 156 L.Ed.2d 663 (2003). Finally, this Court has previously held that Ring and Apprendi cannot receive retroactive application. See Johnson, 904 So.2d at 412 (holding that Ring does not apply retroactively in Florida postconviction proceedings to cases that were final on direct review at the time of the Ring decision); Hughes v. State, 901 So.2d 837, 840 (Fla. 2005) (holding that Apprendi does not apply retroactively in Florida postconviction proceedings to cases that were final on direct review at the time of the Apprendi decision).

CONCLUSION
For the foregoing reasons, we affirm both the trial court's denial of Overton's rule 3.851 motion for postconviction relief and the denial of Overton's second rule 3.853 motion for postconviction DNA testing. Additionally, we deny Overton's petition for a writ of habeas corpus.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] The nonstatutory mitigating circumstances found by the trial court were that Overton would be imprisoned for the remainder of his life so there was no danger that he would commit any other violent acts (given "little weight") and Overton's good courtroom behavior/demeanor (given "some weight"). See id. at 889.
[2] The theory was based on the idea that Nonoxynol is a chemical found in spermicidal condoms, so if the bedding from the MacIvor home tested positive for Nonoxynol, it would support the defense's theory that law enforcement planted Overton's semen on the evidence with the use of a spermicidal condom, which Overton claimed they obtained, from his ex-girlfriend, Lorna Swaby.
[3] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[4] Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).
[5] Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
[6] Huff v. State, 622 So.2d 982 (Fla. 1993).
[7] The trial court granted an evidentiary hearing on only certain paragraphs of Claim II, which were based on ineffective assistance of counsel related to: (8)-(11) the failure to prepare for the hearing on admissibility of scientific evidence under Frye v. United States, 293 F. 1013 (D.C.Cir.1923); (12)-(15) the failure to educate themselves in DNA analysis; (16)-(18) the failure to use expert witnesses to rebut the State's DNA experts; (19) the failure to present the defense that Overton's DNA was planted after the fact; (21) the failure to obtain the additional testing recommended by the DNA expert; (33) the failure to effectively cross-examine FDLE agent Scott Daniels; (34)-(35) the failure to investigate Overton's alibi defense; (36) the failure to investigate alternative theories of the crime; (38)-(39) the failure to impeach Zientek with notes on Overton's alleged confession to him which appeared to be copied from police reports located in Overton's cell; and (40) the failure to impeach Zientek on his testimony that Overton's cell door was never left open.
[8] Richardson v. State, 246 So.2d 771 (Fla. 1971).
[9] These items included rope cuttings, fibers, and matted hair obtained from vacuumings around Susan's body; tape cuttings from both victims; rope found on the rear porch; rope found on the bed; hair from the mattress pad; a stain on the mattress pad; hair obtained from vacuumings taken by Dr. Pope; the sexual assault kit; tape from a T-shirt; fingernail scrapings; semen on the mattress pad; and semen on a bottom sheet.
[10] We choose not to address the merits of two sub-issues here because these claims are both unquestionably procedurally barred. With regard to Overton's claim that he was denied a full and fair evidentiary hearing because the hearing occurred without proper discovery of the Bode Lab documents, the claim was addressed on direct appeal. See Maharaj v. State, 684 So.2d 726, 728 (Fla.1996) ("It is inappropriate to use a collateral attack to relitigate an issue previously raised on appeal."). On direct appeal, this Court held that "the trial court did not abuse its discretion by not finding a discovery violation or by denying the motions for continuance." Overton, 801 So.2d at 896. Thus, Overton is procedurally barred from relitigating the discovery issue with regard to Bode Lab documents under the guise of a full and fair hearing claim. Second, Overton contends that his request for additional experts to rebut the State's testing was improperly denied by the trial court. Similar to the Bode Lab discovery issue, the additional experts issue has already been addressed and rejected on direct appeal. See id. at 897.
[11] It should be noted that Overton's counsel did participate in a limited sense. The trial transcript reflects that Overton's counsel did present objections during the Frye hearing to preserve the argument that there was a discovery violation with regard to the documents from the Bode Lab. Overton's counsel did not participate only in the sense that they did not cross-examine the State's witnesses and they did not call their own witnesses.
[12] Frye v. United States, 293 F. 1013 (D.C.Cir. 1923).
[13] Overton contends that his counsel could have still deposed employees from the Bode Lab even without the discovery that prevented greater participation during the Frye hearing. Contrary to Overton's argument, his counsel stated to the trial court during the Frye hearing that any attempt to depose the Bode Lab employees would have been fruitless due to the lack of discovery that also limited their participation during the Frye hearing.
[14] Overton also contends that his counsel should have challenged the RFLP testing results as all discovery from the FDLE Lab had been received, so his counsel was prepared to present this particular challenge. In addition to the even greater general acceptance of the underlying scientific principle with regard to RFLP testing (as compared to STR testing), there was similar testimony during the evidentiary hearing to illustrate the proper procedures and protocols that existed at the FDLE Lab with regard to the RFLP testing that occurred here. During the evidentiary hearing, Dr. Pollock, who was employed at FDLE when the testing for the MacIvor murders occurred, testified that his FDLE Lab had a quality assurance program in place, which ensured that evidence was stored properly. Thus, there is also no prejudice because the RFLP results were clearly admissible and the results from this testing also matched Overton.
[15] Overton also contends that the failure of his counsel to participate more fully during the Frye hearing was per se ineffectiveness under United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). In applying Cronic, it has been determined that the "attorney's failure must be complete" to fulfill the requirement that counsel entirely failed to subject the opposing case to meaningful adversarial testing. Bell v. Cone, 535 U.S. 685, 697, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). As discussed above, there was not a lack of adversarial testing throughout the entire trial with regard to the DNA testing because Overton's counsel thoroughly cross-examined Pope and Petrick during trial to illustrate the alleged broken chain of custody. Thus, any failure of Overton's counsel was not "complete," and relief under Cronic is not warranted.
[16] Overton does assert that that his counsel failed "to adequately investigate the background of [Zientek and Green]," but Overton failed to assert that which would have been revealed had an adequate investigation of Green occurred. Moreover, an adequate investigation did occur as evidenced by the challenges to Green that were accomplished on cross-examination (i.e., counsel elicited the disciplinary problems that resulted in Green's gain time being lost).
[17] In approximately August 1994, Hernandez, who was only sixteen years old at the time of the MacIvor murders, allegedly advised Lee McCune, who worked for a law enforcement agency, that he (Hernandez) was at the crime scene with Overton but he (Hernandez) did not participate in the murders committed by Overton. McCune said that Hernandez provided information that Overton worked at the Amoco station.
[18] Dr. Katsnelson was a witness presented by Overton's postconviction counsel during the evidentiary hearing, and he did not interact with either the State or Overton's counsel during trial. During the evidentiary hearing, Katsnelson's testimony with regard to his alternative theory of the MacIvor murders included the following: (1) he believed that Michael was killed elsewhere and then moved to the house; (2) he believed that there was more than one perpetrator of the MacIvor murders; and (3) he believed that Susan was not sexually assaulted because the abrasion to her vulva would have been more extensive had there been a sexual assault and the dried fecal matter was likely due to involuntary defecation at the time of death rather than an anal rape.
[19] Swaby, who is also referred to as "Swaybe," was Overton's ex-girlfriend. They ended the relationship around the time of the MacIvor murders. During trial, the defense theorized that law enforcement obtained Overton's sperm through a used condom provided by Swaby and then planted Overton's DNA. According to Overton, he always used a condom during sexual intercourse with Swaby because she had AIDS, and they last engaged in sexual intercourse approximately two to three months before the MacIvor murders.
[20] Overton also contends that paragraphs 22 through 28 of his petition contain a claim that counsel was ineffective for the failure to secure a fingerprint expert to analyze prints found on the metal pipe and tape binding, but the record refutes that the claim was included in these paragraphs.
[21] Overton asserted that the alleged harassment included the following: Overton's car was impounded in 1991, which resulted in the discovery of numerous burglary tools in the car, and law enforcement loitered around the Amoco station where he worked in an attempt to link him to various crimes.
[22] It should be noted that the trial court granted the motion for DNA testing with regard to the sexual assault kit and fingernail scrapings of the victims because the presence of skin cells that are neither Overton's nor the victims' could indicate the existence of another perpetrator and mitigate Overton's sentence. Scrapings are more likely to implicate the perpetrator than hair on tape bindings which could come from any source at any time.
[23] With regard to an editorial on August 29, 1991, containing the statement that the "Florida Keys have forever lost the `innocence' that once seduced many of us to make these islands our home," the statement is taken out of context by Overton. The MacIvor murders were only one of three incidents that the editorial mentioned as a cause of this perceived problem. One of the other three was the "release of two whales from their Key Largo pens."
[24] Contrary to Overton's argument, although this Court on direct appeal did conclude that it was error for the trial court to not dismiss prospective juror Russell for cause, see Overton, 801 So.2d at 893, this does not establish that there was actual prejudice due to the pretrial publicity. First, Russell was a prospective juror who did not sit on the venire because he was dismissed through a peremptory challenge. Second, this Court found error due to Russell's beliefs that a defendant should always testify, see id. at 892, rather than due to any pretrial publicity.